**LEWYS v. O'NEILL et al.**

District Court, S. D. New York.
April 22, 1931.

Charles Firestone, of New York City (Daniel F. Cohalan, of New York City, of counsel), for plaintiff.

Harry Weinberger, of New York City, for defendant Eugene O'Neill.

Hays, St. John, Abramson & Schulman, of New York City (Arthur Garfield Hays and Allan S. Hays, both of New York City, of counsel), for defendants Boni & Liveright, Inc., and Horace Liveright, Inc.

Limburg, Riegelman, Hirsch & Hess, of New York City (Walter M. Schwarz, of New York City, of counsel), for defendant Theatre Guild, Inc.

WOOLSEY, District Judge.

The complaint herein is dismissed with costs, which will include an allowance for counsel fees to all the defendants, as hereinafter fixed and allocated among them.

I. This is a suit in equity based on alleged infringement of copyright, whence arises the jurisdiction of this court.

The plaintiff's book is in the form of a novel called by her The Temple of Pallas-Athenæ, with a subtitle Posterite, and will be hereinafter referred to as The Temple. The plaintiff claims and states underneath the notice of copyright that her book was written in 1917; the printing was begun in April, 1923, and was finished in April, 1924. It was not published but—as stated on the title page—was privately printed for subscribers only. It was copyrighted in May, 1924. There were not any copies sent to reviewers.

The defendant Eugene O'Neill's alleged infringement is by a play called Strange Interlude, copyrighted in February, 1928, first produced on the stage by the defendant Theatre Guild, Inc., and published through ordinary trade channels, first by the defendant Boni & Liveright, Inc., and then by its successor, the defendant Horace Liveright, Inc.

II. A few days before the case was tried, at the request of both parties, I read first the plaintiff's book, The Temple, and then the defendant's book, Strange Interlude.

At the opening of the trial a motion was made by the defendants jointly and severally for a dismissal of the complaint on the ground that, under the decision handed down November 10, 1930, by the Circuit Court of Appeals for this Circuit in Nichols v. Universal Pictures Corporation, 45 F.(2d) 119, (C. C. A. 2) all that was necessary in a case of this kind was to read the two books and record the resultant impressions made on the court.

I denied the motion to dismiss at that stage of the proceeding, because it seemed to me that the plaintiff was entitled to have an opportunity of presenting her case outside the mere text of the two books as far as she properly could be allowed to do so in conformity with the suggestions to trial courts made by the Circuit Court of Appeals in the Nichols Case.

Neither the evidence of the plaintiff nor the argument and brief of her counsel, nor a careful analysis of the two books since the trial, has in any way tended to decrease my first impression that there is not any possible ground for the contention that Strange Interlude is an infringement of the plaintiff's book The Temple.

On the contrary, my reflection in regard to the case and a reading of the relevant authorities and text-books has ripened my first impression into a conviction that the plaintiff has made herein a wholly preposterous claim.

A study of this case, however, is not without its usefulness, I think, because it

illustrates how claims of this kind arise and are fostered.

III. The plaintiff testified that she was born in 1898 in Los Angeles, Cal., and that she wrote The Temple in 1917, when she was nineteen years old—seven years before it was printed and copyrighted.

The Temple was heralded to the waiting world of subscribers for what are known in the booksellers' catalogues as curiosa, in a circular sent out with the plaintiff's approval from Los Angeles, Cal., in March, 1924, by those interested in its sale.

This circular is entitled:

"The Temple of Pallas-Athenæ (Posterite) By Georges Lewys—Edition Limited to 995 Copies, Signed By the Author, in De Luxe Art Format, Large Octavo Size, Privately Printed and Distributed to a Restricted Number of Subscribers Only."

It reads as follows:

"A house of 'pleasure' wherein women of easy virtue are kept—this subject (to quote Kuprin, who treats the problem exhaustively in his 'Yama') of 'the moujik and the prostitute,' is as old as the hills—as old as history, the world, Eden, the fall, chaos.

"But the subject of paternity, or the parturition of human beings as a scientific study—this has not been promulgated. * * * And the subject of a house of impregnation where males are incarcerated for the benefit—not of female lust, but generation—is a new development in literature.

"The male house of assignation in ancient Greece was 'The Temple of Pallas-Athenæ,' in the Acropolis. * * * Transfer this to modern Paris and you have the motif of Georges Lewys' powerful romance of the same name, now being privately circulated among subscribers and members of La Societe des Arts et des Illuminati.

"In announcing publication of 'The Temple of Pallas-Athenæ,' Georges Lewys offers a masterpiece of literature dealing with posterity or the mission of the unmarried father' in social life. * * *

"A Princess of questionable antecedents, frightful exterior and fascinating mentality, attempts to prove the theory of eugenics by the employment of six chosen men as the nucleus for a Temple of Human Culture.

"Here are introduced the charming women from whom the generation is drawn—a rather happy exposition of the possibilities in rational breeding * * * likewise is The Temple a chant of the pagan beauty of Man, stressing the male ideal, which signalizes in older countries an advance in culture beyond any worship or exaltation of the female form.

"The author's rhythm of language, intense causticism of theme and amiable sophistication supplant much of the salacity of the usual book of this kind; Lewys offers an arraignment of the abuses of the married state, coloured with satirical dialogue on that 'most indulged in and least discussed practice of the human race (from the scientific standpoint)—namely, offspring.'

"'The Temple of Pallas-Athenæ provided the female Greeks with specimen reproduction of the highest perfection. * * * Under this term were developed such as later became subjects for the art of Phidias and his followers. * * *'

"Based upon such an ancient research and Greek custom, the work is perfectly scientific, lending itself to a new treatment under the form of fiction.

"The subtlety of its humor and freshness of its theme will appeal to cognoscenti wearied with the eternal intrigues of passion as the motif in literature, and craving original text swathed in the orthodoxy of pure English.

"This is a work of art and a strictly limited edition, each volume being numbered and registered. After these are sold, no further copy can be obtained.

"The book caters to the Illuminati. * * * If you belong to this discerning class of readers whose standing is assured among exclusive gatherings where highclass literature is freely and boldly discussed, we know we may entrust to you a book of the type of 'The Temple of Pallas-Athenæ' with full confidence in the chaste motive, if voluptuous treatment, of the author, and Lewys' power to intrigue you."

In the summer of 1924, after The Temple had been printed and copyrighted, the plaintiff and her mother came on from California to live in New York. During the summer she met Mr. T. R. Smith, of Messrs. Boni & Liveright, Inc., gave him a copy of her book, and had a talk with him about the promotion of its sales.

On February 2, 1925, plaintiff wrote to Mr. Courtney Lemon, the reader for the Theatre Guild, sending him, under separate cover, a copy of The Temple which had, folded in it, a typewritten manuscript which she had entitled a "Résumé of Plot or Stage Play or Spectacle based on Georges Lewys' novel

'Posterite' or 'The Temple of Pallas-Athenæ.' "

In her letter to Mr. Lemon she described The Temple as a satire and also as a somewhat idealistic or humorous work. She mentioned the source of the basic idea of her story, and urged that it be accepted for dramatization by the Theatre Guild because it would "make a distinct departure for your Guild from the realism of the present stage school."

IV. The impression made on me throughout by the examination of the plaintiff was that she had become so obsessed with the idea that Mr. O'Neill had dramatized the plot of her book, that, when challenged, she would seek by every means possible to bolster up her case, even to the extent of attempting recklessly to deny the authorship of letters or papers which she had obviously written.

At the commencement of the trial when the plaintiff was being examined in chief she endeavored to introduce into evidence as the document which she had sent to the Theatre Guild with her book a typewritten manuscript called "A Synopsis of Dramaturgy for The Temple of Pallas-Athenæ (or Posterite) The Novel by Georges Lewys, Outlined for a Psycho-romantic Drama in Five Acts (and Prologue)."

This synopsis of dramaturgy was temporarily accepted as an exhibit for the plaintiff, subject to a motion to strike out, and the attorney for the Theatre Guild was allowed to cross-examine the plaintiff regarding it.

When the letter of February 2, 1925, and the résumé above referred to were first shown to her, the plaintiff claimed that they were forgeries, and had to be reminded by me that an attitude of candor was advisable in courts, especially for a party plaintiff in equity.

Finally she was forced to admit that the letter of February 2d to Mr. Lemon and the résumé which accompanied it were written by her.

These documents were thereupon marked as exhibits for the defendants and a motion to strike out the synopsis of dramaturgy was granted. The latter, however, remains in the record, for it is part of the plaintiff's bill of particulars and will be referred to hereafter.

The case made by the defendant O'Neill and the witnesses called in his behalf and in behalf of the other defendants was in pleasing contrast with the plaintiff's case, although, of course, after the lapse of time which had intervened between the events described and the trial, it was natural some of the witnesses, being busy men, should make some mistakes in unimportant details.

V. In a case of alleged literary larceny like this, previous decisions can do little more than point out the technique of approach to the decision of the question of fact on which alone such cases usually turn.

But there is a necessary background involving the theory of the growth of literature which has seldom been better discussed than by Dr. Samuel Johnson who never touched on any subject without measurably adding to the store of common sense concerning it.

On Tuesday, October 2, 1753, in The Adventurer, No. 95, Dr. Johnson wrote an essay on plagiarism in which he called attention to the fact that the common field in which authors necessarily have to work is comparatively small, and that as a consequence similarities are often observable between them when they come to deal with similar or cognate subjects.

He wrote:

"The allegation of resemblance between authors, is indisputably true; but the charge of plagiarism, which is raised upon it, is not to be allowed with equal readiness. A coincidence of sentiment may easily happen without any communication, since there are many occasions in which all reasonable men will nearly think alike. Writers of all ages have had the same sentiments, because they have in all ages had the same objects of speculation; the interests and passions, the virtues and vices of mankind, have been diversified in different times, only by unessential and casual varieties; and we must, therefore, expect in the words of all those who attempt to describe them, such a likeness as we find in the pictures of the same person drawn in different periods of his life.

"It is necessary, therefore, that before an author be charged with plagiarism, one of the most reproachful, though, perhaps, not the most atrocious of literary crimes, the subject on which he treats should be carefully considered."

Then, after discussing writers on history, religion, and morality, and dealing with the expectable similarities in the treatment of such subjects, he continues:

"The same observation may be extended likewise to the passions; their influence is uniform, and their effects nearly the same in every human breast; a man loves and hates, desires and avoids, exactly like his neighbor; resentment and ambition, avarice and indo-

lence, discover themselves by the same symptoms in minds distant a thousand years from one another.

"Nothing, therefore, can be more unjust, than to charge an author with plagiarism, merely because he assigns to every cause its natural effect; and makes his personages act, as others in like circumstances have always done. There are conceptions in which all men will agree, though each derives them from his own observation."

Then, after touching on love and hate, he says:

"Every other passion is alike simple and limited, if it be considered only with regard to the breast which it inhabits; the anatomy of the mind, as that of the body, must perpetually exhibit the same appearances; and though by the continued industry of successive inquirers, new movements will be from time to time discovered, they can affect only the minuter parts, and are commonly of more curiosity than importance."

After dealing further with the emotions, he says:

"Here then is the fund; from which those who study mankind may fill their compositions with an inexhaustible variety of images and allusions; and he must be confessed to look with little attention upon scenes thus perpetually changing, who cannot catch some of the figures before they are made vulgar by reiterated descriptions.

"It has been discovered by Sir Isaac Newton, that the distinct and primogenial colours are only seven; but every eye can witness, that from various mixtures, in various proportions, infinite diversification of tints may be produced. In like manner, the passions of the mind, which put the world in motion, and produce all the bustle and eagerness of the busy crowds that swarm upon the earth; the passions from whence arise all the pleasures and pain that we see and hear of, if we analyze the mind of man, are very few; but those few agitated and combined, as external causers shall happen to operate, and modified by prevailing opinions and accidental caprices, make such frequent alterations on the surface of life, that the show, while we are busied in delineating it, vanishes from the view, and a new set of objects succeed, doomed to the same shortness of duration with the former; thus curiosity may always find employment, and the busy part of mankind will furnish the contemplative with the materials of speculation to the end of time."

Among his Seven Lectures on the Law and History of Copyright in Books, Mr. Augustine Birrell, K. C., M. P., the well-known English barrister, statesman, and man of letters, has a lecture entitled "Literary Larceny." He says near the beginning of that lecture, on page 167 of his book:

"Ideas, it has always been admitted, even by the Stationers' Company,[1] are free as air. If you happen to have any, you fling them into the common stock, and ought to be well content to see your poorer brethren thriving upon them. * * *

"What is it that is protected by copyright? Reproduction, of course. But what else? What is plagiary, and is it a breach of the law? The sublimity and vast reading of Milton have not protected him from the charge of stealing from a Dutchman; the exquisite scholarship and taste of Gray have not deterred persons who have read more than they have enjoyed from laying blind hands on his images and affiliating them elsewhere. To trace the origin of phrases has a fascination for some minds. Who first said 'End it or mend it'? But nobody has suggested that Gray's 'Elegy' or 'Paradise Lost' was not entitled to the benefit of whatever copyright law existed in this country in 1751 and 1665 respectively.

"The literary larcenist must do more than filch ideas, imitate mannerisms, repeat information, borrow phrases, utilise quotations; you must be able to attribute to him the felonious intention of appropriating without independent labour a material part of a protected work. To do this is, in the eye of the law, to infringe copyright—to misuse your brother author.

"Our Law Reports are full of cases of the kind—interesting cases they are too, and one thing they show very conclusively—that legal proof of literary larceny is difficult. That a particular leg of mutton is mine is capable of easy proof or disproof, but how much of my book is mine is a nice question. Byron, who had a masculine intelligence, in other words, a robust conscience, writing to Moore, says: 'Galt says there is a coincidence between the first part of the "Bride of Abydos" and some story of his, whether published or not I know not, never having seen it. He is almost the last person on

[1] The Stationers' Company long had control of books in England by a system of licenses, and Stationers' Hall was the place of such registration of copyright as the law of Great Britain used to require. Cf. Birrell, Law & History of Copyright in Books, pp. 71-96; Coppinger on Copyright, pp. 15, 174, 254, 279.

whom anyone would commit a literary larceny, and I am not conscious of any witting theft of any of the genus. As to originality, all pretensions to it are ludicrous—there is nothing new under the sun."

These quotations indicate better than anything which I have been able to find elsewhere, the background against which courts have to act in cases of alleged plagiarism, and the zone, fortunately narrow, within which law impinges on letters.

■ VI. Functioning within that narrow zone, the courts find that the first question in a case of alleged literary larceny is whether there is any direct evidence of access by the defendant to the plaintiff's book.

■ In this case there is a categorical denial by Mr. O'Neill, who was examined by a written commission in Paris on August 12, 1930, that he ever heard of the plaintiff's book, The Temple, until he read in the Paris Herald in early June of the year 1929 that the present suit had been brought on May 27th of that year.

About a month after this suit was brought a copy of the book, sent by Mr. Weinberger, his attorney, reached Mr. O'Neill, who, on Mr. Weinberger's insistence, read it for the first time. This was in the early summer of 1929.

Mr. O'Neill says, in his commission, that before he wrote Strange Interlude he never saw, or read, or had any synopsis, or any outline for any dramatization, or scenario, of The Temple, or any outline or synopsis of its characters, dialogue, detail, or arrangement of the plot, or settings of background, or any part thereof.

He says that neither Mr. Lawrence Langner nor Mr. Courtney Lemon, nor any one else, directly or indirectly, connected with the Theatre Guild ever had any conversation with him at any time with reference to The Temple, its plot, scenario, or outline for dramatic purposes.

He says he never had been talked to or written to about The Temple, its plot, scenario, synopsis, or outline by Thomas Smith, or Horace Liveright, Inc., or Boni & Liveright, Inc., or any one connected with Horace Liveright, Inc., or Boni & Liveright, Inc.

The statements by Mr. O'Neill that he did not receive any information whatever about The Temple from Mr. Langner, Mr. Lemon, or Mr. Smith is confirmed by the evidence of those gentlemen at the trial. Counsel stipulated on the record that Mr. Horace Liveright, if called, would give identic evidence.

I do not see any reason whatever for disbelieving the essence of their testimony which entirely disproves any access through them by Mr. O'Neill to the plaintiff's book, although, of course, as above noted, busy men such as they might possibly make mistakes in minor details.

■ The plaintiff has put great emphasis on the fact that Mr. O'Neill did not come over himself for the trial of the case and expose himself to cross-examination.

Of course the decision to come or not to come rested entirely on Mr. O'Neill's own judgment and that of his counsel. They probably thought that the plaintiff's case was so weak that Mr. O'Neill need not interrupt his life in France and his work there in order to come over for the trial. The event has proved that their judgment was correct.

The plaintiff complains of the written commission as being an inept method of getting at the truth in a case of this kind. The history of this commission is worth noting.

The plaintiff's attorney first addressed two wholly improper interrogatories to Mr. O'Neill which were stricken out by Judge Bondy when the interrogatories on commission were settled.

The plaintiff did not file any further cross-interrogatories, as she might well have done, and did not make any motion for an open commission. The expense of such a commission could, of course, have been arranged to abide the event, and on such a commission plaintiff's counsel would have had an opportunity of orally cross-examining Mr. O'Neill, as they now claim so earnestly they desired to do.

Now that the case has taken the shape of his examination on commission without cross-interrogatories, they seek to erect their own inactivity into a grievance against Mr. O'Neill, and to ask me to discredit his denial of any access to The Temple because he has not seen fit to come over and be present at the trial.

In not coming, of course, he ran a risk, but that was his privilege, and I think, in view of the fact that the plaintiff's lawyers did not address written cross-interrogatories to him or make any move for an open commission, they have not any basis whatever now on which to make a claim that his failure to appear at the trial is any evidence of his desire to avoid telling the truth.

It must be remembered, moreover, that Mr. O'Neill's position is not limited to a flat denial. He particularizes with regard to

his early notes as to Strange Interlude. He annexes to his commission photostat copies of the notebooks in which these notes were contained, and exhibited at the trial the originals, the authenticity and dates of which I have no reason to doubt.

Mr. O'Neill says that the first written record he has of the underlying idea of Strange Interlude was made in the autumn of 1923 at Ridgefield, Conn. It was entitled Godfather, and a photostat of it is annexed to the commission as an exhibit in this case.

Mr. O'Neill says that he is able to fix the date of this note because he remembers that he made it in the autumn of 1923 at the time when he was writing the scenario for his play Desire Under the Elms, and because it was during the previous summer of 1923 at Provincetown, Mass., that he heard from an aviator, formerly of the Lafayette Escadrille, the story of a girl whose aviator fiancé had been shot down just before the armistice, with the result that the girl had gone to pieces from the shock, had become neurotic and desperate, and had started drinking and having promiscuous sex affairs. Finally she married, not because she loved the man whom she was marrying but because she wanted to have a child and hoped through motherhood to win back a measure of contentment in life.

It is Mr. O'Neill's habit, when one of his notes eventually grows into a play, to write the name of the play across the note. The name Strange Interlude and the date 1926 is written diagonally across the note headed Godfather of which the story just detailed was the basis.

Mr. O'Neill then describes the growth of this idea in his mind. He has in the same notebook a photostat which was an exhibit annexed to the commission, of a detailed scenario of Strange Interlude with notes of possible other titles for it. This scenario follows in the notebook the scenario of The First Man and covers four pages, written in his minute handwriting which is quite difficult to read. It is followed by the scenario of Desire Under the Elms.

Mr. O'Neill points out that the names of the characters in the scenario of Strange Interlude were changed later when he actually wrote the play—that some were left out and others added.

In addition to the notebook, the original longhand script of the play, on deposit in a safe deposit box here, was tendered for production, but I did not require it.

Mr. O'Neill says that the scenario of Strange Interlude was written in 1925 at Nantucket, Mass.; that he started the play at Bermuda in the spring of 1926, and wrote the next four acts at Belgrade Lakes, Me., in the summer of 1926, and the final four acts in the winter of 1926–1927, at Bermuda, finishing it finally in February, 1927, at Bermuda.

Mr. O'Neill frankly admits that he discussed the germ of the idea, which developed into the play—an idea for a series of psychological plays depicting the outer and inner life of a woman from the age of young womanhood until forty-five—with George Jean Nathan in the spring of 1923, after he had finished writing Welded. Mr. Nathan, when called, confirmed this.

While Strange Interlude was being written he says that he discussed its psychological aspect with Dr. G. V. Hamilton, and the technique of the use of spoken thoughts, which he so effectively employs, with Professor George Pierce Baker, of Yale University, when in New Haven at the time he was given his degree of Doctor of Letters at the Yale Commencement of 1926.

He also says that he discussed what he had written up to that time with Kenneth MacGowan when the latter visited him at Belgrade Lakes, Me., in 1926.

Mr. O'Neill says that he did not receive any suggestions from others during the writing of Strange Interlude, and that it was written out in his own handwriting before it was typed.

He denies explicitly that either Mr. Liveright or Mr. Smith of that firm, or any one directly or indirectly connected with Boni & Liveright, Inc., gave him any ideas or made any suggestions to him concerning the writing of the play. He makes the same denial also regarding Mr. Langner and Mr. Lemon, of the Theatre Guild.

Eventually Strange Interlude was produced by the Theatre Guild in January, 1928, and published by Boni & Liveright, Inc., predecessors of Horace Liveright, Inc., in March, 1928.

Mr. O'Neill states that he did not make any changes in the play except some cuts during the rehearsal thereof when he trimmed it down so that the time of playing it could be somewhat reduced, and, consequently, that the book is slightly longer than the acting script, but that the book is the original completed version.

Mr. Nathan, the well known dramatic critic, stated that he had known Mr. O'Neill since 1919, when he was editor of Smart Set in which some of Mr. O'Neill's shorter plays were published.

He says that Mr. O'Neill often discussed his short plays with him.

Mr. Nathan thinks that he first heard of the idea of Strange Interlude when they were walking up Sixth avenue, probably in February, 1923. At that time Mr. O'Neill was working on a play called Welded which Mr. Nathan did not like. Mr. O'Neill then told him that he wanted to write a play dealing in great detail with a woman's emotional life from young womanhood until forty-five, taking a young woman who had lost her idealism and was attempting to recapture it.

Mr. Nathan says he has made very few suggestions of any kind to Mr. O'Neill and had not made any suggestions whatever about Strange Interlude.

Mr. Nathan testified that he had never heard of the plaintiff's book before this suit. Much was made of the fact that he used the phrase "a temple of Pallas-Athene" in a humorous criticism of a motion picture in a copy of Judge, dated August 20, 1927. This inconsequential fact, however, did not make any impression whatever on me for, of course, the phrase "a temple of Áthene," by the confession of the plaintiff's own résumé, is as old as the heroic age in Greece, and has, therefore, been in the public domain more than two thousand years.

I found Mr. Nathan the most acute and competent of witnesses and I accept his evidence in toto.

Mr. Peter Mulligan, who was called by the plaintiff to attack the credibility of Mr. T. R. Smith, is now in the restaurant business at Freeport, Long Island. At one time he worked for Macmillan & Co., and then became a publisher's agent. He seems to have been well acquainted with Mr. Smith since some time shortly after the war, and at one time shared Mr. Smith's apartment with him.

He stated that he tried to interest Mr. Smith in The Temple in the summer of 1924, first showing him the circular mentioned above and then bringing him a copy of the book which he had been reading himself. He does not know what became of that copy, but did see a copy of the book in Mr. Smith's library.

Mr. Mulligan agreed to take over the selling agency of The Temple for Miss Lewys and had several hundred copies, both of The Temple and another book by Miss Lewys called Merry-Go-Round. They were sent by express from California in 1924, apparently after The Temple had been excluded from the mails.

Miss Lewys, on being recalled and with her memory refreshed by the evidence given by Mr. Mulligan and Mr. Smith, says that Mr. Mulligan telephoned to her apartment asking if he might bring Mr. Smith to see her, that he had done so, and they had discussed books in general, and The Temple in particular. She admitted, on cross-examination, that she does not claim that Mr. Smith had sent a copy of The Temple to Mr. O'Neill. In fact she stated that once she planned to go into business with Mr. Smith, but that the arrangement was not consummated.

The plaintiff's great surprise witness Mulligan, therefore, added nothing of value to her case.

The suggestion adumbrated during the trial that Mr. O'Neill might have got access to the plaintiff's book whilst it was in possession of Mr. Lemon or Mr. Smith, because charwomen had keys to their respective offices, is wholly unworthy of consideration, and, if it were not on a parity with most of the plaintiff's contentions in this case, I should not have mentioned it.

Under these circumstances I find that the plaintiff has entirely failed to make out by any direct evidence that Mr. O'Neill had any access to her book before he wrote, or whilst he was writing, Strange Interlude.

VII. Inasmuch as there is not any direct evidence of access by Mr. O'Neill to her book, the plaintiff is thrown back necessarily on the question of a comparison between her book The Temple and Mr. O'Neill's play Strange Interlude.

The plaintiff contends that the denials as to any direct access to her book made by Mr. O'Neill and the other defendant witnesses called in that regard must be deemed to have been overcome by a comparison of the books in respect of the words used, the characters portrayed, and the arrangement of the scenes.

Consequently, she claims that from the alleged resemblances in these respects I should infer that Mr. O'Neill and the witnesses who testified at the trial in defendant's behalf have perjured themselves, and to find that Mr. O'Neill read a copy of The Temple which had been at the office of Boni & Liveright in the possession of Mr. Smith, or at

least was informed by some one in detail about the book.

A comparison of the books as the test of the truth of the denials of the defendant witnesses does not in any way shake my belief in their evidence.

A few samples of the plaintiff's processes of comparison will suffice for illustration of their fantastic nature without going into any great detail.

The plaintiff has certain points which she refers to as "finger prints" which, she claims, show that Mr. O'Neill must have read her book, that he dramatized part of it, and that he wrote Strange Interlude from it.

One of these is that she has a doctor in her book called Dr. Cramwell who comes of a good family in Philadelphia and went to Munich in his youth where he sowed his wild oats. The defendant, she says, has a doctor named Darrell who also comes from Philadelphia and goes to Munich for what she describes in her bill of particulars as his "capers." The fact that the names of the two men each end in "ell" is regarded by the plaintiff with suspicion as are the excursions to Munich.

She also makes a great point of the fact that Mr. O'Neill did not on his examination on commission specifically deny that Darrell was copied from Cramwell.

Neither as characters nor as names are the two doctors alike, and I venture to guess many doctors from Philadelphia have been to Munich.

The second of the so-called finger prints reaches more fantastic heights.

There is an instance in the plaintiff's novel when Adonais, one of the young men who is kept at stud as a professional father in the palace of the Russian princess, Gortacheff, in Paris, goes to the roof and looks at the stars in the spirit which is described as one of exaltation and reflects on the number of the descendants through whom his blood would flow.

The plaintiff regards it as of the most profound significance that, at the end of the first act of Strange Interlude, the father of the heroine, who is a professor at a New England University, after his daughter has determined to leave him, crosses his library, turns for comfort to his books, pulls down a volume which he opens at random and reads a Latin quotation of somewhat obscure provenance, which turns out to have been from lines 95 to 98 of the fourth book of Astronomica, a poem in five books, by the Latin poet Manilius, of whom it is said that he was neither quoted nor mentioned by any ancient writer, but of whom several editions have been published since the first in 1579. The quotation refers to the not uncommon phenomenon of a man on a high place at night looking with wonder at the stars and endeavoring to read his fate in them.

I think it is incredible that, if Mr. O'Neill wanted to plagiarize the passage of the plaintiff's book to which she refers, he would have had to take the trouble to seek a quotation from a little known Latin author to conceal the fact that he was copying a passage from the plaintiff's book, when he might have easily dealt with such a comparatively usual emotion in English words which would have been equally effectual in covering his theft.

Another instance of alleged plagiarism which the plaintiff emphasizes greatly reaches the borderland where sense gives place to nonsense. She claims that the name Gordon Shaw, used as the lost fiance of Nina Leeds in Strange Interlude, was secured thus:

In The Temple there is a Russian princess named Gortacheff, of horrible aspect but limitless wealth, who has an altruistic interest in sex and, hence, finances the temple. There is a statue of Athene in the temple; there was a sculptor named St. Gaudens; Adonais was the leader of the stud in the temple; Shelley wrote a poem called Adonais and was a friend of Lord Byron, whose middle name was Gordon. I do not recall, at the moment, just where the name of Shaw came in. But this is another "indelible finger print" on Mr. O'Neill's play.

Absurdity could not rise to greater heights.

What I have just been mentioning is within what the plaintiff calls the category of paraphrase and which she claims constitutes plagiarism.

Plaintiff makes in all four hundred and fifty-five comparisons of words and phrases, of which she emphasizes twenty-one in the list given in defendant's Exhibit O put in on her cross-examination.

She even goes so far as to claim plagiarism because a character in The Temple, at page 272, refers to his uncle as "an old fox," and, at page 23 of Strange Interlude, Marsden uses the expression "old fox" in connection with Nina's father.

More examples of claims of this kind would be merely tedious. It suffices to say that, inasmuch as the plaintiff cannot claim a copyright on words in the dictionary, or

on usual English idioms, or on ideas, the alleged paraphrasing comes to naught as an attack on the denials of the defendant and his witnesses.

VIII. The next category of similarities which plaintiff emphasizes is the similarity between the characters in her book and in Mr. O'Neill's play.

It is true that there are old and young people in both plots. It is true that there are fathers and mothers and daughters and sons. But, after having carefully read both books more than once, I think it is fair to say that in the plaintiff's book the characters are merely types—the socially ambitious mother and daughter, the obtuse but successful American business man, the dissipated foreign nobleman, the middle aged English philanderer, and the fabulously rich Russian princess. None of these types is individualized sufficiently to make the characters of the defendant any possible infringement of the plaintiff's copyright.

In the defendant's book, on the other hand, the characters are individualized and are perceptible in the round, as it seems to me, to a very extraordinary degree.

█ The plaintiff cannot copyright a type any more than could Miss Nichols in the case of Abie's Irish Rose, by taking for her characters stock figures, such as a low comedy Jew or a low comedy Irishman. Cf. Nichols v. Universal Pictures Corp. (C. C. A.) 45 F.(2d) 119, at pages 121 and 122. We may, therefore, dismiss the question of any possibility of infringement of the plaintiff's types in The Temple by the defendant's characters in Strange Interlude.

IX. After having unsuccessfully attempted to palm off the synopsis of dramaturgy taken from her bill of particulars as the document which she submitted to Mr. Courtney Lemon as a basis for a dramatization of her book for the Theatre Guild, the plaintiff was—as above noted—forced to admit that what she sent to him was the so-called "résumé."

When this is compared with a summary of Strange Interlude, it effectually disposes of the plaintiff's third contention—a copying of the scenes, structure, and story of her book by the defendant.

The résumé sent by the plaintiff to the Theatre Guild for dramatization of her novel is as follows, quoted verbatim:

"The story is basically designed as a satire. Characters are adapted from life among social leaders in France, England and America. The story rests on a scientific foundation: the Greek custom of 'specimen reproduction' or selective parenthood. Scientific reproduction of the human species was incorporated in a Greek ritual, practiced in the ancient Temple of Pallas-Athenæ in the Athenian Acropolis. The words 'Pallas Athene' mean 'Phallus the Serpent.'

"A house is built in Paris in the present day for the same purpose, six male specimens are incarcerated there, and the handsome American and European women who are married to senile, awkward, or debauched husbands ('mariages de convenience'), visit this house without the knowledge of their husbands in order to obtain beautiful children and to improve the human race.

"The book is divided into three parts. The first traces the ancestry of all the actors in the drama, including the principal male inhabitant of the Parisian Temple of Pallas-Athenæ, called Adonis (Adonais). * * * The second part is inside the Temple, describing the furnishings and life of the male specimen, the actual ritual of the Temple, and contrasts this sublime beauty with morbid conditions of marriage and debauchery in the so-called normal relationships outside. * * * The third part of the book takes up the generation following—the descendants of these male specimens and follows out their life stories, dwelling principally on the two chief actors. * * *

"In Samaria (the Holy Land) a wealthy young merchant marries with great pomp a Circassian maiden noted for her beauty. The young man is a handsome Hebrew. They have a son who is called Adonais (blessed of God—Hebrew for the Phoenician Adonis), because of his marvelous beauty and physical perfection. When the child is four years old, his father's life is threatened from mysterious sources. The Circassian mother flies with the child to Stamboul. During the Moslem feast of Ramazan, she is seen by the Sultan Abdul Medjid, who, struck with her remarkable beauty, takes her into the Medjidieh Palace as an odalisque of the Seraglio. On the breaking up of Ramazan two years later —the most colorful pageant of the Bosporus —the odalisque escapes on a French ship with her child and reaches Paris. She learns that her husband has been murdered and his wealth seized. In Paris, penniless, but still clothed in georgeous harem dress, she is sheltered by an art student in the Quartier Latin. He takes her and the child into his atelier, she becomes his mistress, they raise the boy and he becomes a painter. The mother dies

The boy, handsome as a god in his twenty-second year, paints his own portrait in the semi-nude. It is hung in the Salon as 'The Portrait of Adonis, by Himself.'

"Here it attracts the attention of a Russian Princess, living in Paris. The Princess, Cosima Nicolaevna Gortacheff, illegitimate daughter of royal parents, is the homeliest woman in the world. She is gross, ill-shaped, repulsive; she is enormously wealthy; she is a great patron of the arts; she has a remarkably keen mentality and a strong personality; her one passion is 'beauty.' Her private dietetist, Dr. Oliver Cramwell, has taught her the science of eugeny or the breeding of beautiful human beings, and she has besides a book called 'The Humanculture of Naudeim,' from which she learns of the Greek Temple of Pallas-Athenæ, also of the experiments in this line made in Phoenicia, Egypt, Eturia, etc. She conceives the idea of remodeling her magnificent palazzino of seventy-two rooms in Paris along the lines of the Athenian Temple; sends for Adonis, the young painter, instructs him to follow Naudeim's scientific replica of the Greek Temple; and then the Princess leaves for New York for a tour.

"In New York the Princess meets the Duke and Duchess of Strassbourg. The Duke represents a very decadent Franco-German line of nobility. The Princess knows him, his family, and their frightful and licentious history. The Duchess was Henriette Pederman of Chicago, the daughter of a millionaire pork-packer. This has been a title-money marriage. The Princess warns Henriette of the insanity and depravity atavic in the Strassbourg lineage and admonishes her not to make him a father. Henriette agrees, arranging to see the Princess later in Paris.

"The Princess also meets in New York Mr. and Mrs. Sigmund Obermyer. Obermyer is called the 'Silver King' of Utah, an undersized, ill-formed and middle-aged man of bromidic qualities and complacency. His wife is Sonia, charming young daughter of a splendid Baltimore family, noted for the succeeding generations of female beauty of its members. This is another 'mariage de convenience.' Sonia's mother, a former sweetheart of Dr. Cramwell, the Princess' private physician, begs Sonia to cling close to the Princess for social reasons. All go to Paris.

"On the return of the Princess Gortacheff to Paris, the new Temple of Pallas-Athenæ is ready for occupancy. Adonis, the painter,

has decorated and refurnished the palazzino until it is a miniature 'Paradise of Man' within, a replica of the Greek Temple. Every detail of beauty and decoration is shown here, a voluptuous and amorous atmosphere where colours, occupations and surroundings have a direct bearing on the generative function for which the Paradise is designed. The Princess Gortacheff seeks out five young artisans, equally handsome as types of male perfection, and incarcerates them in the Temple.

"In order to excuse the radical and unusual procedure typical cases of Parisian life are now revealed: the man who will not have a child through selfish reasons; the man who cannot have a child through physical defect or sterility; the man who should not have a child through his debaucheries or heritable lecherousness. A panorama of conditions is displayed, accentuating the need for measures of selective parenthood. The wives in these cases are understood to be among those who have recourse to the Temple.

"The Duc and Duchesse de Strassbourg visit his family in Belnorte, France. Henriette observes here first-hand the family conditions of the man she married and is appalled by the 'refined viciousness' of this ancient noblesse. The Marquis du Plessy de Tourbayville, younger brother of the Duc de Strassbourg, diseased, debauched, in debt, kills himself. Henriette flees to Paris, buys a villa, and calls upon the Princess Gortacheff, confessing all that has taken place of a vitiated nature at Belnorte. The Princess advises her to visit Adonis, the handsome painter who is perfectly chaste, and sends her to his beautiful bedchamber. Henriette seduces Adonis, who loves her. She also loves him, but vows never to see him again if she is with child by him.

"Adonis, now understanding the full mission of the Temple he has created, and being madly in love with Henriette, begs the Princess Gortacheff to allow him to go away. The Princess refuses, explaining to him his great progenitive mission and confessing the full story of her birth in the Russian Crimea. This story is one of violence at the Tsar's Court. Sympathizing with her, he consents to remain as a regular male inmate of the 'Paradise of Man' atop the Temple.

"Mr. and Mrs. Sigmund Obermyer of Salt Lake City, Utah, decide to spend the following summer at Heligoland, the English bathing resort. When the summer is over, Mrs. Obermyer manages to rid herself of her uxorious and repulsive husband by sending

him to London, and repairs to Paris with her mother.

"Twenty-two years have passed. The Princess Gortacheff has died. Dr. Oliver Cramwell is an old man. Henriette, Duchesse de Strassbourg, has a handsome young son, the Marquis Francis-Charles. He believes himself to be the son of the Duc Louis de Strassbourg; he is, of course, the son of Adonis. The Duc, very debauched, is failing in health. Frank-Charles, raised in Chicago, at last visits the home of the Duc at Belnorte, France, meets a lovely young woman on the steamer, finds she is Patricia Obermyer, the daughter of the Utah Obermyers; the young people love each other, confess their passion, become engaged to marry. Immediately the match takes on international importance—a union between two great American fortunes, coloured on his side by an old French title. Newspapers and newsreels are filled with the important event, according to the regular custom. Preparations are made for the marriage in the Church de la Madeleine of Paris. (This part of the story is a deliberate stinging satire on these international matches made so much of in the United States news columns, etc.)

"The night prior to the wedding, the Duc de Strassbourg disappears from his home in Paris. He visits the underworld, drugs and debauches, and is found in a semidelirious condition in the street gutter. He is taken to his home and becomes insane, the family curse of the de Strassbourgs overtaking him. When this reaches the ears of Sonia Obermyer, she refuses to allow her daughter Patricia to marry the scion of an insane house, and cancels the marriage agreement.

"This breaks the young man's heart. Francis-Charles becomes morose, brooding on the eventuality of inheriting the stigma of dementia from his 'father.' He believes he is doomed to madness. He upbraids his mother, Henriette, in a violent accusation. (This is one of the highest points in the book.) He says: 'You have made me of the stock; you have cursed me with tainted blood. What is there left in life for me? What is the use of anything? * * * And I blame you: Yes, the mother of a deficient child is to blame for that child.' * * * Henriette, to save her son's reason, confesses to him that he is not the son of Duc Louis. She explains to him that she met his father while married to Louis, that aware of Louis' family history and hereditary taint, she deliberately snatched a child from another source—a chaste and physically and mentally pure

young man. She cannot tell Francis-Charles his father's name because she never knew it. He is astonished, but with modern sophistication and appreciation of the situation, he congratulates her. * * * Still he realizes that he cannot reveal this story to Patricia as he must safeguard his mother's honour.

"Henriette, without her son's knowledge, goes to confess the truth to Sonia Obermyer in order to reunite the young couple. She expects to be socially ostracized for her adultery. To her astonishment Sonia is delighted, confessing in her turn that the match is an ideal one, because Patricia is also 'a child of the Temple of Pallas-Athenæ! Sonia has also had recourse to the Temple for her child, refusing to reproduce the ill-formed and disgusting Sigmund Obermyer. (This is the second high moment of the story).

"The mothers congratulate each other and are about to part, fully reconciled that the marriage shall take place following, and that they will unite their eugenically parturient children, when Sonia inquires of Henriette: 'Which one of the six (male specimens in the Temple) was the father of Francis-Charles?' Henriette answers: 'Adonis!' Sonia collapses. 'He was Patricia's father also!' she cries.

"The children are half sister and brother.

"There is, a brief epilogue in the book which continues, as a discussion, the fate of these two children of the Temple. The young Marquis, endowed with an artistic sense from Adonis, his natural father, becomes the chief patron of the Paris Opera House and keeps a beautiful opera singer as his mistress. * * * Patricia Obermyer, like so many wealthy young daughters of plutocratic families in America, remains single, and society always wonders 'why,' but never knows. * * *"

A summary of the defendant's play follows:

1. The first act of Strange Interlude opens in the library of Professor Leeds' home in what is described a small university town in New England on an afternoon in the late part of a summer subsequent to the Great War.

Marsden, a middle aged Anglicized New England gentleman, who is an intimate of the family, and, though many years older than Nina, the professor's daughter, is secretly in love with her, comes in, having just returned from Europe, speaks aside his thoughts at returning to this New England house which has been long familiar to

him. The room is filled with pieces of old New England furniture and lined with book-shelves containing a large proportion of classics in the original Greek and Latin, books in modern languages as well as early English authors ending with Thackeray. Thus is Professor Leeds dated.

Professor Leeds enters, Marsden greets him and asks for Nina. He gets the impression that the professor is anxious about her, and when he is told that she dreams about Gordon Shaw, her fiancé who was killed in an airplane during the war, he feels that things have somewhat changed during his absence. The Professor explains that, though on the surface matters go on much as usual, Nina is haunted by Gordon, and that Nina's condition is such that her mind seems to confuse the real and the unreal; that her mind dwells perpetually on her lost lover.

Nina enters the room and at first does not see Marsden. Finally she welcomes him somewhat coolly for an old friend, and she then says that she has made up her mind to leave her father's house that evening. This, apparently, is the first time that the subject of her leaving him has come to any definite decision, and the professor is evidently much upset by it.

During all this scene the thoughts of the characters, spoken as asides, seem to throw their words into clearer relief and to allow the reader or spectator to see the characters in the round more than in the conventional play where the device of asides for thought is not used.

Finally Nina, emphasizing what she calls her treachery to Gordon in not having married him before he left for the war, states that she is going to pay for the sex deprivation which she caused Gordon, and, for his sake, is going as a nurse to a soldiers' hospital and there enter into sex relations with the wounded men as a kind of expiation for her failure to marry Gordon.

Her blunt statement of her regrets and of her purpose results in the confession by Professor Leeds that he had suggested to Gordon that he and Nina should not marry until he returned from the war.

Marsden is a spectator of all this, and finally leaves the room with Nina who has asked him to help her pack for her trip.

Then Professor Leeds, with tears in his eyes, thinks aloud of the future, of the impending college term, of what being a trained nurse will mean for his daughter, of his empty house, and of her leaving him, of his own death one day in the old house alone, and turns to his bookshelves, pulls down a volume, opens it at random and reads aloud the Latin quotation from Manilius.

2. Act 2 is also Professor Leeds' study on a night in early autumn a year later.

Professor Leeds has died and Nina has returned for the funeral. She comes in dressed in a nurse's uniform and brings with her Dr. Darrell from the hospital where she has been during the past year.

Marsden is in the room and Nina greets him. They are then joined by Sam Evans, a college friend of Gordon Shaw, who is in love with Nina and wants to marry her. Evans is sent on an errand by Darrell.

Nina goes upstairs to her father's room and Darrell tells Marsden about Nina's relations with the wounded men at the hospital and says that in his opinion the only way to rescue her from the promiscuous affairs in which she had been indulging is to have her marry. He suggests Sam Evans who is much in love with her and whom Darrell knows well and likes.

Marsden, in love with Nina himself, does not take kindly to this idea, but after a scene with her in which she shocks him by a matter of fact confession of her life during the previous year he suggests that she marry Evans. Nina takes to it not unkindly and falls asleep in Marsden's arms as he is sitting in a chair in the library. He tells Evans, who has returned, that he thinks he has reason to hope and then carries Nina to her room.

3. Act 3 is seven months later. Nina and Sam Evans on a belated honeymoon to the Evans home in Northern New York where Marsden joins them. During this visit Sam Evans' mother sees that Nina is enceinte and tells her that there is a strain of insanity in Sam's father's family, that Sam's father died in an asylum, and that an insane aunt lives with her at the family homestead. Mrs. Evans suggests to Nina that she should get rid of her impending baby, and in order to have happiness for her husband, and for herself, should seek outside of her marriage another child who would not have a taint in its blood. Mrs. Evans also states that she had never been able to bring herself to do this but had always regretted that she had not.

Nina is very much moved and weeps in her mother-in-law's arms, but does not commit herself to any plans.

4. In act 4, we return to Professor Leeds' study, the books have remained as they were, but the furniture has been moved and the

writing table no longer presents the orderly aspect of the professor's time.

There is a sense of uneasiness between Evans and Nina who is not well. Evans is trying to carry on with his work, but there seems to be something wrong, although Nina tells him that she loves him and suggests a renewal of their marital relations, having in the interval between this act and the last disposed by abortion of their impending child.

Into this household full of unrest Darrell returns in his capacity of doctor to advise on Nina's health. When he and Nina are alone Nina tells him of the insanity in her husband's family and suggests that Darrell should become the father of a child by her for the sake of her husband and also to gratify her own desire for motherhood. Darrell is astonished at the suggestion, but finally agrees.

5. Act 5 is at a seaside house which Sam Evans has rented.

Nina and Darrell's affair has progressed for some time and Nina is expecting another child. They have fallen in love and Evans is wholly unaware of their relationship. Darrell comes in; Sam in ignorance leaves, and Darrell unsuccessfully tries to be professional and ends by making love to Nina.

Marsden, whose mother had died meantime, enters and suspects the situation; leaves after insulting the medical profession generally. Darrell announces that he is sailing for Europe. Evans goes to say good-bye to him and Darrell tells him that his wife is going to have a baby.

Evans rushes to Nina and rejoices with her. Nina is embarrassed and pretends that it is not so, but finally admits it and feels a rush of sympathy for her husband in his joy.

6. By the sixth act the baby, little Gordon, has arrived. Evans is becoming a successful man and is very happy. He tries to get Marsden to join him in his business by putting money into it.

Darrell suddenly and unexpectedly returns, called back by his father's death. He and Nina each wonder what the other's feelings may be.

Marsden observing them sees that they are in love. Nina speaks of the baby Gordon, named after her dead fiancé, and Marsden, angered at what he feels he has discovered, leaves suddenly.

Then follows a love scene between Nina and Darrell when suddenly Evans comes in

full of hilarious pleasure at seeing his old friend.

Marsden returns, and Nina, indulging in the somewhat polyandrous reflection that each of these three men is necessary to her, goes up to bed after kissing them each in turn good-night.

7. It is eleven years later, when act 7 opens, in a Park avenue apartment in New York, on little Gordon's birthday. Nina and Darrell are both there, also little Gordon, then eleven years old, who watches them.

Darrell has been away working in a biological laboratory in the West Indies, but has returned to Nina as he feels forced to do from time to time.

Nina and Darrell talk. Little Gordon looks on. Finally he sees Darrell kiss his mother—a scene which Darrell and his mother try to explain away but which seems to remain in the child's memory.

Little Gordon, to whom Darrell has given a sailboat as a birthday present, destroys it in anger.

Marsden comes in. Then Evans, to whom little Gordon is devoted, comes in. Darrell leaves, stating that he is going to sail in a few days, and Evans, now a successful man, talks to his son and wife and suggests that Gordon should not be babied so much as theretofore now that he is getting older.

Nina feels a rush of hatred for him and hopes that some day she may be able to tell him the truth about Gordon's birth.

8. Act 8 is ten years later. The scene is on board Evans' yacht in the Hudson river. It is an afternoon in June and the yacht has come up for the college boat races at Poughkeepsie.

Nina is there, Darrell has come back from Central America, and Marsden is there. Sam Evans is looking out over the water, for the start of the races, and a girl, Madeline Arnold, who is young Gordon's fiancée, is standing with him.

Evans is nervous and excited because his son Gordon is rowing on one of the crews. He rushes about the deck, makes Madeline and Marsden go into the cabin with him for a drink, and Nina and Darrell on deck talk over their love affair in a kind of pensive retrospect.

Evans comes on deck again and is most enthusiastic about having his son Gordon win the race.

Nina begs Darrell to tell Evans—whose pride in young Gordon irritates both of them

—of the fact that Gordon is not his son. Darrell refuses and turns away to watch the races. Marsden comes out of the cabin, joins Nina, and makes love to her more openly than usual. They are joined by Darrell.

Nina tries to tell Madeline that she cannot marry Gordon, but Darrell speaks up and tells Madeline that Nina is not herself and she must not pay any attention to what she says.

The excitement of the boat races becomes more and more intense, and attention is focused on that until, in the midst of the cheering, Evans has a sudden stroke and falls on the deck.

Darrell kneels over his old friend and finds that he is not dead. Nina cries that she will never leave her husband and Darrell shows real grief.

9. The scene of the last act is in the garden of the Evans Long Island home on the North Shore after Sam Evans' death.

It opens with a love scene between Madeline and Gordon. Marsden breaks in on it, the three talk, and then Madeline leaves.

Nina and Darrell come out of the house. Gordon is offish with Darrell, and after some discussion of his father's will, by which half a million dollars has been left to Darrell's Biological Statión in the West Indies, but which Darrell does not wish to accept, Gordon slaps Darrell across the face. Darrell does not strike him.

Nina asks Gordon what his father would have said to such an act, and Gordon is overcome with remorse and apologizes. Finally they shake hands. They have a long talk, the matter of the legacy is settled by Darrell's accepting it, and finally Gordon says that he must rejoin Madeline, and leaves without learning that Darrell is his father. Then Darrell leaves, and as the play ends, Nina is seen with Marsden's arm about her sitting on a garden bench looking up at Gordon's plane in the air above her. Nina, yearning for peace after unrestful years, has apparently accepted Marsden—loves' remainderman.

Thus the defendant's play tells the life of one woman and shows her sexual vagaries induced by various emotions, some normal and some pathological. It centers about her feeling for a man who was killed in the war for whom desire had been thwarted. It is an intensely personal theme, and her desire for a healthy child is not to improve the race, or entirely to avoid her husband's heredity,

but to produce a child who would be worthy of her dead lover.

The plaintiff's book purports to be propaganda for eugenics. Its plea, if any, is racial rather than personal, and it shows the limitations necessarily placed by eugenics as a practice under our present prejudices when a popular stud-father is involved.

Two young folks, patterns of perfection, became engaged, but have to part when their mothers find out at the last moment that they have the same stud-father.

There is a Latin motto opposite the last page of the book, "Abusus Non Tollit Usum," which carries the supposed moral of the book —Misuse of· a good idea does not argue against its proper use.

One looks in vain for the parallelism between the plots in respect of any matter not long in the public domain. The idea of stud-fathers is, by the plaintiff's own confession, as old as the Greeks; hereditary taint in a family has been the subject of many books, and the expression of a desire to avoid perpetuation of such taint certainly was not new with the plaintiff, nor is the idea new of secret extramarital relations for any purpose which may interest those involved.

X. It seems to me, after a careful study of the plaintiff's bill of particulars, in the light of her evidence, that the genesis of this suit is traceable to the effect on the plaintiff's mind of reading Mr. Malevinsky's ingenious and interesting book on The Science of Playwriting, in which the question of plagiarism is tested by the use of a somewhat complicated formula, and not by the pragmatic method of comparing the books in question, prescribed by Judge Hand in the Nichols Case. Cf. (C. C. A.) 45 F.(2d) 119, at 123.

The plaintiff's bill of particulars first came before me during motion term in December last on a motion by the defendants aimed at its being made more coherent. At that time it fairly bristled with extracts from or paraphrases of Mr. Malevinsky's book, including even some citations of authorities, and its whole rationale was in accordance with his teaching.

I advised the plaintiff's attorney then that the court was entitled to an intelligible bill of particulars, and that I required him to file a bill of particulars which was drawn up by a lawyer and not by the party plaintiff. Accordingly an order was entered for the clarification of the categories involved.

The first bill of particulars is excusable in part, perhaps, because it was filed before

the decision in the Nichols Case, by the Court of Appeals, had cleared the atmosphere for such suits as this. But the influence of Mr. Malevinsky's book still had such momentum with the plaintiff, that in her partially new bill of particulars the synopsis of dramaturgy, cf. Malevinsky, chapter II, page 38, is still to be found, and certain citations of authorities from his book are still embedded in other parts of it like fossil remains of an earlier geologic epoch.

In support of my thesis, it is a very significant fact, I think, that the plaintiff's bill of particulars contains what she calls her synopsis of dramaturgy for The Temple, which, when read in the light of her résumé above quoted, is evidently an ex post facto production, written after she had read Strange Interlude, and in which the story of The Temple is materially changed in order, apparently, to approach nearer to the plot of Strange Interlude, than do either The Temple or her interpretation of it in her résumé. Thus she has made an inept attempt to parallel Mr. O'Neill's play in her so-called dramaturgy in order to prove that he plagiarized her novel.

The résumé sent to Mr. Lemon shows what the plaintiff considered to be the dramatic plot of her novel, before the bee of litigation commenced buzzing in her bonnet. It seems to me wholly different from the plot of Mr. O'Neill's play.

The plaintiff, however, by working from her synopsis of dramaturgy as a base, has brought herself to believe, or at least to swear that she believes, that Mr. O'Neill paraphrased her sentences, copied her characters, and took his plot from her book; and in order to support this delusion she has allowed herself to indulge in comparisons in all three categories so grotesque that it confirms me in the belief that, for a party, litigation has greater refractive power than any other medium.

XI. The question now remaining is to determine the amount which I should allow as attorneys' fees to the defendants in a wholly synthetic case like this.

In her complaint, in addition to praying for the usual injunction, the plaintiff claims damages in the sum of $1,250,000, for which she seeks recovery, and she also alleges that the defendants have realized profits, for which she craves an accounting, of over $1,-000,000 up to the commencement of the suit.

The plaintiff, therefore, has played for high stakes and lost.

The expense of their success will necessarily bear heavily on the defendants.

Fortunately in copyright cases Congress has seen fit to leave the courts free to adopt the wise English practice of throwing a large part of the expense of litigation on the unsuccessful party.

Section 40 of the Copyright Act of March 4, 1909 (now title 17, U. S. Code, § 40 [17 USCA § 40]), provides: "In all actions, suits, or proceedings under this title, except when brought by or against the United States or any officer thereof, full costs shall be allowed, and the court may award to the prevailing party a reasonable attorney's fee as part of the costs."

In determining what is a reasonable fee for an attorney, the elements to be considered, among others, are the amount involved, for that measures the attorney's responsibility; the amount of work necessary; the amount of work done; the skill used, and the result.

Chancering my allowances for fees to the defendants by these considerations, I fix as reasonable fees for the attorneys of the several defendants the following amounts which I hereby award severally to the defendants: To Eugene O'Neill, as the principal defendant, on whom the heaviest burden fell, the sum of $7,500; to Boni & Liveright, Inc., and Horace Liveright, Inc., together, as they were represented by one firm of attorneys, the sum of $5,000, to be allocated between them as they see fit; and to the Theatre Guild, Inc., the sum of $5,000, making in all $17,500.

These allowances are to be recoverable against the plaintiff and are to be included, under the provisions of title 17, U. S. Code, § 40 (17 USCA § 40), as part of the costs hereby allowed the defendants severally, in the final decree dismissing the complaint herein.

XII. I think that this opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½ (28 USCA § 723) and I will sign an order accordingly. Briggs v. United States, 45 F.(2d) 479, 480 (C. C. A. 6), and cf. The El Sol (The Sac City) 45 F.(2d) 852, 856, 857 (D. C.).

Settle orders and decrees on two days' notice.