## MOESTA v. BRIGGS MFG. CO.

### No. 5075.

District Court, E. D. Michigan, S. D.

Oct. 10, 1936.

Harness, Dickey, Pierce & Hann and Arthur W. Dickey, all of Detroit, Mich., for plaintiff.

Whittemore, Hulbert & Belknap, William J. Belknap, William H. Gross, and Arthur C. Beaumont, all of Detroit, Mich., for defendant.

TUTTLE, District Judge.

This is a suit involving the Moesta patent No. 1,548,204, dated August 4, 1925, for water-cooled portable electric welding machine. It also involves the Moesta patent No. 1,703,683, dated February 26, 1929, for spot welding machine. These patents will hereafter be referred to as the first and second patents in suit. Plaintiff, Moesta, charges infringement of claims 3, 4, 11, and 12 of the first patent in suit and both claims of the second patent in suit.

Among others, the principal defenses as to both patents in suit are invalidity and noninfringement. As to the first patent in suit, defendant pleaded and urged at the trial that the plaintiff, Moesta, was not the inventor of the things patented therein which were made by certain employees of the Michigan stamping plant of the defendant company.

The presumption is that the patentee made it, and the burden of proving by a fair preponderance of the evidence that somebody else made it rests upon the defendant. The evidence leads me to the conclusion that the trouble men, when they had trouble with the cable which became heated, were the men who rigged up the invention in a temporary way to cool the cable by the use of the rubber hose. It seems plain to me that plaintiff then conceived the idea of grabbing that thought and that invention for his own and getting a patent on it.

There is no question but that he dated his drawings back. The drawings are of the device defendant had in the factory with the hose added and dated back almost three years. The original drawing has disappeared.

These men who made this invention did not plan to get a patent on it. It did not occur to them to apply for a patent, so there is no surprise that they have no written record as to what they did. But they got the garden hose and put it on that machine. I am satisfied that when plaintiff saw what these other men had done he immediately and promptly made a drawing with erroneous date upon it, with equal

haste made a blueprint, and took the blueprint to his attorney but did not tell his attorney that it was a blueprint from a drawing that was misdated. He knew, of course, that these trouble men had thought of this thing and constructed it along in November or December of 1923. He promptly laid his plans to claim that he had made the invention more than two years prior thereto.

Plaintiff's subsequent conduct bears out this same theory. If he had made that invention, he would have been anxious to perpetuate a correct date so that he could prove a correct date, but the only bit of proof that he has in writing bears a false date.

Plaintiff testifies that when he filed this bill he thought that he had made this invention before he went to work for defendant. If a man had been at the defendant's factory, had· made this invention and had put it on the apparatus that was overheating and it kept it cool, he never in the world would have such a faulty memory that he would get it into his head that he invented it at some previous time. Memories just do not work in that sort of a way. Plaintiff knew when he filed his suit that this invention had been made by these men in the defendant's factory, and he knew he had a blueprint with a false date on it, and he still had the idea of carrying out that false idea. This is a deliberate scheme continued through the years to claim that plaintiff had made this invention before he went to work for defendant.

After defendant's workmen had made the invention, plaintiff evidently made a water-cooled cable of the same type with better mechanical connections; had it made on the outside and induced defendant to pay him $100 for the unit. That all happened after the defendant's workmen in the factory had put on a rubber hose to cool the cable. Later on, plaintiff went to one of the men who had built the unit for him and secured from him a false written statement tending to corroborate the false date on the blueprint. Plaintiff, by trickery, succeeded in making the witness think that the unit had been made before plaintiff went to work for defendant. .

This is a case of plaintiff's intentional misrepresentation of the thing and getting the witness, Butler, to remember it in an incorrect way. Butler, I am inclined to think, at the time he made the written statement thought it was true, but that was another thing to the discredit of plaintiff,

because plaintiff knew then, as he knew all the way through, that this invention was made by others at defendant's plant while he was working there. Plaintiff has known all the while that the invention was made by others in defendant's employ, and he only changed his story about that when he got caught by the fact that his witness, Butler, said he was going to tell the truth.

This is a case of a man who had not made any invention, but got his patent and started his suit on a false claim that he was the inventor and falsely tried to get witnesses to testify to support him in that false claim, and when they were too honest to do it, or afraid to do it, and refused to go through with it, then he claims that his memory has changed and testifies that he made the invention at the time others actually made it, when he was employed by defendant.

I find, and I have no reasonable doubt about it, that plaintiff did not make this invention. Every test which I know how to apply in making findings of fact where there is a dispute leads me to that one positive conclusion.

I think in view of the state of the art that there was room for the claims of the first patent in suit except as to claim 11. I think claim 11 is so broad that it would apply to any method of cooling a flexible cable, so I do not think it should have been allowed. Flexible cables were old and water-cooled cables were old. It was old to cool rigid cables. It was old to cool cables that were flexible, but not with·a flexible casing. The one thing that was new is the flexible casing around the flexible cable to contain water for cooling it.

Now when we go back to this invention and the way it was made, we do not need to bother very much with the prior art for the reason that defendant had the complete outfit, except for the flexible casing. As far as the cooled electrode was concerned, it was in the machine. It either was or else defendant knew how to put it in. So we have a complete machine doing just as good work before as it did afterwards, except the cable got hot.

The combination was all in the machine on which the invention was made, and in connection with which the invention was made, and all that was added to the combination that was new was the flexible water jacket around the outside of the flexible cable and through which the water would flow to cool the cable.

I think there was room in the art for claims 3, 4, and 12. I have in mind now how close the Davis patent No. 873,216 comes to that, because Davis does show the cable with a hole through the middle of it for the water to pass through, both with a pipe running through the middle of it and with a coil running through the middle of it. Of course, with the coil you put in the water and then you have a jacket around it. Davis tells about that too, and the casing would be the jacket, and the water forced through the middle would flow all around the electric cable and all the strands thereof.

■ The Davis patent comes very close to being the first patent in suit, unless the first patent is narrowly construed, as I would have held had I been called upon to do it. I would have held that the teachings of Davis were really for going through the inside, washing, bathing the inside of it, and that it was only incidental that it got to the outside so that it could be said that there was a jacket on it. It is my conclusion that claim 11 is void, reads on the prior art, but that claims 3, 4, and 12 do have an ingenious idea. They emphasize the fact of the jacket and of the bathing of the outside and letting the water go down through it, while Davis emphasizes the inside bathing of the cable and having the conduit inside.

■ I hold that claims 3, 4, and 12 would not be infringed by what the defendant does. Plaintiff's claims speak of a jacket and emphasize it. In allowing the claims for the jacket, I would not hold as an infringement a cable built exactly like Davis, and that is all defendant has.

I do not reason that this is the sort of an invention that has to do with the spot welder art. It has to do with the art of keeping cables cool which carry electricity. It would not matter whether it was a riveting machine or a spot welder or arc welder. It may be true that some of them need cooling more than the others, but it is the art of keeping cool a flexible cable which is transmitting electricity and gets hot because of the amount of electricity that is going through it. That is the thing that we are talking about.

Therefore, I say claims 3, 4, and 12, except that the patentee is not the inventor, could be saved if limited to a flexible jacket that goes around a flexible cable and the water is circulated through the jacket to keep the cable cool, but the state of the art is such that while I might save them, I could not give them a liberal construction. I should be forced to narrow them sufficiently so that any one who has an old spot welder with a flexible cable on it that was getting hot could take that cable off and put on any one of the Davis cables and cool it without infringing.

So I dispose of the first patent in suit in favor of the defendant and against the plaintiff for two reasons: First, it is not plaintiff's invention; and, second, if it were, it is not infringed. The defendant has not infringed because they are cooling their cables the way Davis cools them.

■ That brings me to the second patent in suit. I think the most that can be said for the second patent is that it is a sort of design, a mechanical method of construction; and there again, in order to save it over the prior art, you have to give some pretty narrow and peculiar meaning to a yoke or frame or head, and then, having done it, when you come to interpret it, in order to read it on to what the defendant does, you have to read it in a way that it reads on what was old in the art.

The patentee says he attached his fixed electrode to the cylinder and carried it by the cylinder, and attached the movable electrode to the cylinder, and the only way you can say he attached it to the cylinder is to say, if you are talking about the movement of it, that it is moved by the piston and the piston is carried by the cylinder. But all of these uses of a cylinder and piston in connection with this art arose out of the following thing. They first put these two electrodes together by hand, putting one on one side of the work and the other on the other side of the work, and then letting the electricity go through and heat the places in the work between the two electrodes until they were hot enough so that they would stick together, then letting them cool off and they would be fastened together. Now, instead of holding them together by hand, they early began to use a little cylinder and valve and attached it on in such a way that they were held together by air pressing the piston down, and the piston in turn pressing the movable electrode down. The usual way is to have one of the electrodes fixed and the other movable and advance the movable one by a piston in the cylinder.

In order to hold the fixed electrode so that it would not recede when the movable

one came down to it, they attached the fixed one to the walls of the cylinder, and they attached the movable one to the piston of the cylinder, and so when the piston was forced down the electrode was forced down, and when the piston receded the movable electrode receded.

That was old in the art; it ran through the art where they used these pistons.

You will find that the fixed electrode is secured in some way to the cylinder and that the movable one is secured in some way to the piston. Sometimes they put the movable electrode on the end of the piston, as the defendant does in this case. Sometimes they have a complicated series of levers that move it. The plaintiff in his case has a cross-arm that goes out and moves; as the piston goes down it moves the movable electrode down in a plane parallel to the movement of the piston. It does not matter about that. They all get their movement of the movable electrode from the movable-piston, and they all make their rigid electrode rigid because it is secured in a rigid way with the walls of the cylinder.

That is in substance all that this plaintiff did, except that he put the cylinder in as a part of the yoke. It is a part of the head. The defendant follows the old art. He secures his outside of the yoke. But, of course, that is such a narrow distinction that I do not feel justified in holding patents good that are so narrow that I have to make such a ridiculous holding on the subject of infringement.

I think the sensible, fair way in a patent like the second patent in suit is to say that it is void rather than to give it some narrow construction which amounts to a design.

This plaintiff attached a fixed electrode to the cylinder, and the movable one to the piston. That was old, and plaintiff could not get a patent on that.

The second patent in suit is void, and I so hold and dismiss the bill.

Upon authority of Briggs v. United States, 45 F.(2d) 479, 480 (C.C.A.6); Lewys v. O'Neill et al. (D.C.) 49 F.(2d) 603, 618; Hazeltine Corporation v. Radio Corporation of America (D.C.) 52 F.(2d) 504, my opinion may stand as the findings of fact and conclusions of law under Equity Rule 70½ of the Supreme Court (28 U.S. C.A. following section 723).