Sherwin S. CLOTH and Lev Gleason Publications, Inc., Plaintiffs,

v.

Mae HYMAN, Random House, Inc., Ira Levin and Maurice Evans and Emmett Rogers, general partners of a copartnership, doing business as "The Sergeant's Company", Defendants.

United States District Court
S. D. New York.
Sept. 28, 1956.

Andrew J. Feinman, New York City, for plaintiffs.

Choate, Ronalds, Reynolds & Hollister, New York City, for defendant Mac Hyman, William A. Moore, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant Random House, Inc., Jacob F. Raskin, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendants Maurice Evans and Emmett Rogers, d/b/a "The Sergeant's Company", Charles H. Tuttle and Thomas A. Shaw, Jr., New York City, of counsel.

HERLANDS, District Judge.

Plaintiffs having consented to an adverse summary judgment in this literary copyright infringement action, the Court is required to decide two questions: (1) whether the Court, in its discretion, should award reasonable attorneys' fees to the victorious defendants; and (2) if so, what amount would be reasonable in the circumstances of this case.

In opposing any award of attorneys' fees, plaintiffs assert that this action was brought in the sincere belief that their copyrighted story had been pirated by defendants.

In support of defendants' request for substantial fees, defendants charge that plaintiffs' cry of plagiarism is knowingly false, and that this is a "strike" suit.

The dramatis personae of this litigation are: (1) plaintiff Cloth, author of "Bucking for Section 8," the story al-

leged to have been infringed; (2) plaintiff Lev Gleason Publications, Inc., alleged ultimate assignee of the copyright covering "Bucking for Section 8"; (3) defendant Hyman, author of the book "No Time for Sergeants," and (4) defendant Random House, Inc., both accused of infringing the copyright on "Bucking for Section 8," by publishing a novel, "No Time for Sergeants"; (5) defendant Levin (not served and not before the Court), whose dramatization of "No Time for Sergeants" allegedly infringed the copyright on "Bucking for Section 8"; (6) defendant Evans and (7) defendant Rogers, general partners doing business as "The Sergeant's Company," which has produced and is currently presenting the Levin play, "No Time for Sergeants."

According to the complaint filed February 9, 1956, plaintiff Cloth "created" the story "Bucking for Section 8" at some undesignated time "prior to September 25, 1945." The complaint characterizes the story as "original" and states that it contained "a large amount of material wholly original with * * * Cloth." Prior to September 25, 1945, plaintiff Cloth submitted the story to Picture Scoop Company, which accepted the story for publication in a periodical (now defunct) called "Readers Scope." It is further alleged that Picture Scoop Company secured the copyright of that story by virtue of a certificate of registration for the "November, 1945 [1] issue" of "Readers Scope," of which the story was a component part; and that "by duly executed assignment" [2] the copyright became the property of plaintiff Lev Gleason Publications, Inc.

The complaint demands: (1) a preliminary and permanent injunction; (2) an accounting of the defendants' profits and damages of not less than $250 for each infringement; (3) the impounding of all infringing copies and the plates and molds; and (4) costs of the action and "reasonable attorneys fees to be allowed to the plaintiffs by the Court."

The answers, consisting of denials, were filed on March 6 and 7, 1956.

Plaintiffs' copyrighted story (attached as "Exhibit I" to the complaint) is in the form of an anecdote, entitled "Bucking for Section 8." [3] The following are the last two paragraphs of the story:

"Perhaps the most amusing case is that of the Latrine Orderly who cracked because of constant inspections. One day he wired all the toilet seats to one central pull wire. Not long afterwards the inspecting officer entered expecting to receive the customary salutation. Instead he was greeted by a startling performance. His appearance brought a lusty "Ten-shun" from the Orderly who then pulled the wire and caused all the toilet seats to stand erect like a squad of wooden soldiers.

"The officer, instead of considering the scene a show of inventive genius, felt it an audition for a Section 8. He recommened (sic), a Board approved and the Orderly is now a civilian."

By notice dated and served March 6, 1956, defendants commenced appropriate proceedings for a pre-trial examination of plaintiffs and for the inspection and discovery of specified papers and records.

On March 8, 1956, plaintiffs served their notices for the pre-trial examination of defendant Evans (to be held on March 20, 1956) and for the pre-trial examination of the defendant Hyman (to be held on March 27, 1956). In connec-

---

1. Defendants have produced conclusive proof that the Cloth story was published in the December 1945 issue, and not the November 1945 issue.

2. Upon the 114-page pre-trial deposition of both plaintiffs, they were unable to produce any written assignment or oth-

er documentary evidence of like import.

3. In his pre-trial deposition, plaintiff Cloth testified that the phrase "Bucking for Section 8" is army jargon for acting eccentrically in an attempt to obtain a discharge on psychiatric grounds.

tion with the latter examinations, defendants were required to produce all relevant papers and documents.

Plaintiffs were examined on March 15, 1956. The Cloth deposition runs to 73 pages; the Gleason deposition to 41 pages. From these depositions, the following facts, *inter alia,* emerge:

From July 1943 to March 1946, Cloth served as a private in the United States Army, Transportation Corps. At various times in the course of his army career, he was stationed at Upton, New York; Fort Knox, Kentucky; Camp Chaffee, Arkansas; Camp Bowie, Texas; and Camps Ross and MacArthur, California.

From time to time during his army service, he would submit to various magazines (including "Readers Scope") short anecdotes and jokes. These items are called "fillers" by the publishing trade. Three out of five of these fillers were army anecdotes. Cloth received $5 or $10 for each published item; and that is what he received for "Bucking for Section 8."

Claiming that "Bucking for Section 8," submitted by him in 1944 or 1945 to "Readers Scope," was completely original with him, plaintiff Cloth gives the following description of how he was inspired to write that anecdote (Transcript, 17–18):

"Q. 4. Had you heard this story or become privy to it, from others? A. No. Actually, I did a lot of latrine duty in the Army myself, and, well, when you are in the sort of a situation, your mind wanders to keep your mind off the things that you are doing, and it occurred to me.

"Q. 5. What occurred to you? A. The situation, because of the constant inspections, the way they were handled. Well, when you are in this position, the feeling that these inspections are kind of ridiculous, and having a comedy turn of mind which I am—I am a gag writer primarily—this occurred to me,

to do this sort of a thing, or not to do it, but to possibly see a situation of this type. Since I was in the position of thinking of things to submit to magazines, when this thing hit me, as a thought, I created it into the article at hand.

"Q. 1. What is it that hit you? A. The idea of—well, the commanding officer coming in, calling attention. I was the only one in the place, which was kind of silly. Normally as a latrine orderly you say attention normally in a barrack, and all the men jump up and stand at attention, and in this particular case, I was the only man present, and well, as though the seats were company to me, it occurred to me that possibly it might be a funny situation, if a thing like that would occur where the seats would stand at attention, because they were the only objects besides myself that were movable in the latrine."

Passing defendants' arguments of law, which cast serious doubt on the fundamental legal basis of plaintiffs' claim, we turn to a consideration of defendants' evidence that the very story which plaintiff Cloth calls his brainchild was in the public domain and was, specifically, widely circulated in army circles during the precise period when Cloth was serving in the army.

This evidence, contained in the convincing affidavits submitted by defendants in support of their motion for summary judgment, may be summarized as follows

(A) *Captain Forest Hutchings,* of the United States Air Force, swears: "The idea of rigging army latrine seats with a wire so as to cause them to stand upright when the wire is pulled was employed in a story related to me in 1944." Captain Hutchings was then in navigation school at San Marcos, Texas. The story was told to him and his classmates by their instructor, a Lieutenant Dean. Captain Hutchings repeated the story to defendant Hyman in the spring of

1950, when they were both taking a refresher course at Mather Air Force Base, Sacramento, California. (The latter fact is confirmed by defendant Hyman.)

(B) *Nadeau Pearl*, now retired after twenty years' service in the United States Army, states: "Throughout the years of my said service I have heard several versions of a story involving a latrine orderly who rigged latrine seats so as to cause them to stand upright during latrine inspection." Pearl traces the story to the summer of 1935 at Fort Dix, New Jersey, where the report of an incident of that exact character was "circulated throughout the camp at the time."

(C) *Sergeant Robert F. Joyce*, of the United States Air Force, states that he personally witnessed a bond-rally stage production in the spring of 1944 at the Mosque Theatre in Richmond, Virginia, and that a skit burlesquing army latrine inspections showed a latrine orderly who, upon the entrance of the inspecting officer into the latrine, shouted "Ten-shun" in a loud voice and, at the same time jerked "a wire which caused the toilet seats to be snapped from a horizontal to an erect position. The inspecting officer displayed surprise and outrage."

(D) *Lieutenant Colonel Robert P. Knapp, Jr.*, a West Point graduate who served in the army from 1940 to 1946, now an attorney associated with the firm of Breed, Abbott & Morgan, and a member of the Bar of this Court, swears that he first heard the story in 1941 or 1942. After presenting explanatory details, he states that the anecdote "received such wide repetition" that it became "part of the folklore of the Army."

(E) *Fred Hawkins* swears that, on March 22, 1943, while serving in the Army at Fort Jackson, South Carolina, "there was published in the regimental newspapers (sic) of the said 397th Infantry Regiment, which newspaper was entitled 'The Bull Sheet' an article written by me, * * *. The said article recounts an anecdote about army latrine inspections which was not original with

me, but which I had theretofore heard during my army career." Attached to the Hawkins' affidavit as an exhibit, is a photostatic copy of "The Bull Sheet" for March 22, 1943. The following anecdote appears in a column entitled "Battalion Banter," written by "Pvt. Hawkins":

"Corporal Matthews relates an incident that occurred while he was with the Army Show, which we deem worthy of passing on.

"It seems that one of the show men was up for reclassification as mentally unbalanced. Meanwhile, he was placed in supreme command of the latrine. One morning, the Major was to inspect it. Whereupon the cagey cuckoo arranged a string stretching under all the seats, held one end in his hand behind his back, and patiently awaited the inspection. Presently, the Major entered. With all the force and gusto of a first sergeant, the orderly snapped out, 'Latrine, atten*HUT*!', pulled the string and all the seats came to attention. Corporal Matthews assures us the 'nut' is now a civilian."

Confronted by the foregoing evidence, plaintiff Cloth admits that "he cannot controvert" the Hawkins' affidavit and the anecdote as published in "The Bull Sheet"; and that his chances of winning this case are "extremely problematical." Nevertheless, he still "firmly and sincerely" believes "that the story which is the basis of this action was original with me (Cloth). It is not an unusual coincidence that a story could occur to two totally unrelated people independently and I believe that is what has happened here."

Plaintiffs' attorney has submitted an affidavit in which he states that he still believes that Cloth originated the story —a statement that he qualifies by the proviso: "although I concede the possibility that Mr. Cloth may have heard the story and and completely forgotten that he had."

If further evidence were required to demonstrate the absence of good faith on the part of plaintiffs when they asserted—and still assert—that Cloth's story was an original creation, such proof is contained in the following comparison between "The Bull Sheet" story and Cloth's version:

| "The Bull Sheet" (March 1943) | Plaintiff Cloth (December 1945) |
|---|---|
| 1. The introduction refers to a man who was up "for reclassification as mentally unbalanced." | The title refers to "Section 8" which is the basis for discharge as a mental case; and the introduction refers to a man who "cracked." |
| 2. The soldier was placed "in supreme command of the latrine." | The man was "the latrine orderly." |
| 3. The Major was to "inspect" it. | Reference is made to "the inspecting officer." |
| 4. The orderly arranged a string stretching under "all the seats" and he held one end of the string in his hand. | The orderly wired "all the toilet seats" to one central pull wire. |
| 5. "Presently, the Major entered." | "Not long afterwards the inspecting officer entered." |
| 6. The orderly snapped out, "Latrine, atten*HUT*" with "force and gusto." | The orderly brought forth a "lusty 'Ten-shun'." |
| 7. The orderly "pulled" the string. | The orderly "pulled" the wire. |
| 8. "All the seats came to attention." | "All the toilet seats" were caused "to stand erect" like soldiers. |
| 9. The orderly "is now a civilian." | The orderly "is now a civilian." |

The foregoing evidence demonstrates that plaintiff Cloth had actual and ready access to the army anecdote that was widely circulated while Cloth was serving in the army; that "Bucking for Section 8," written by Cloth, was neither original in conception nor literary treatment; [4] and that plaintiffs' assertions in their complaint that the story was original with Cloth and Cloth's pre-trial testimony describing how he was "inspired" to write that story are belied by the facts. A birthright so spurious cannot be legitimatized by a copyright.

The above findings are sufficient to predicate the Court's decision. However, the Court has made a further examination of plaintiffs' assertions because the element of plaintiffs' good faith in commencing this action is of major importance in determining whether to allow attorneys' fees to defendants. We take up, then, plaintiffs' charge that "Bucking for Section 8" was "copied

---

4. This case does not present that aspect of literary borrowing to which Montaigne, Essays (Modern Library ed.), bk 1, ch. 26, p. 129, alluded:
"The bee rifles the flowers here and there, but she afterwards makes honey of what she has gathered, which is all her own; * * *."

Nor does this case involve "aesthetic subtleties, dialectics, and controversies" that—according to an eminent contemporary legal philosopher—"the average English or American judge" will seek to avoid in deciding a literary copyright case. Cahn, The Moral Decision, 199, 200 (1955).

largely" by defendant Hyman in his book "No Time for Sergeants" and by defendant Levin in his dramatization of that book.

Plaintiffs' story consists of three paragraphs. The first paragraph refers to three cases of feigned mental illness: soldiers who try "to get out of the Army" by indulging "in odd endeavors born in a supposedly twisted imagination." The second and third paragraphs describe a genuine mental case—that of a latrine orderly "who cracked because of constant inspections" and who is, therefore, discharged on psychiatric grounds.

In sharp contrast, the latrine orderly episode in defendants' story does not involve either a spurious or genuine mental case; nor does it conclude with an army discharge.

The hero of defendants' story is a hillbilly named Will Stackpole. His pristine ignorance is impervious to army discipline and protocol. He achieves local fame as a well-meaning yokel, who knows nothing "about doin' things military-like" (No Time for Sergeants, Act I). The author uses Will's army career as a lampoon of the armed services. The latrine incident, keyed to broad comedy, is slap-stick satire of the system of inspections, mockingly personified by the inspecting colonel and captain. Of the captain, the play says that "the latrine * * it's the Captain's hobby. * * * when everything is sparkling, the Captain sparkles too. * * * " ; and when he inspects the "incredible" latrine, the Captain remarks, "I'm happy" (No Time for Sergeants, Act I, pp. 41, 45).

Will prepares for the Colonel's inspection by fixing "somethin' special" with "some nails and a board and some wires" (No Time for Sergeants, Act I, p. 90). At the Colonel's inspection, the command "Ten-shun" is given; "Up comes Will's arm in a snappy salute, down stomps his foot, up fly the toilet seats; clattering, banging, quivering at attention." Will shouts, "Latrine ready for inspection, sir." ·The Colonel and the Captain are dazed and furious.

Will's explanation is that he was only "Welcomin' the Colonel, sir." (No Time for Sergeants, Act I, pp. 92, 97–98)

Defendants' book portrays substantially the same incident (pages 89, 90, 92, 93, 135–139). Will is assigned to gunnery school and then serves in the Air Force. The dénouement is the award of a medal to Will for erroneously reported heroism.

While the latrine episode in defendants' novel and play is similar to the corresponding episode in plaintiffs' anecdote to the extent that they embody the mechanical idea of wiring toilet seats in such a way as to cause them to stand upright during a regular latrine inspection in the army, defendants' novel and play differ fundamentally from "Bucking for Section 8" in context, motivation, expression, character and literary merit.

Two or three alleged verbal similarities between plaintiffs' and defendants' writings hardly measure up to significant evidence of copying, especially in the frame of reference of the entire record. To the extent that, arguably, there are such similarities, they are traceable to the over-arching fact that both writings culled the latrine episode from a common source. Only in that sense are they privy to each other. For purposes of this case, such resemblances are as "fortuitous," for example, as identical words used by writers of lyrics who consult the same rhyming dictionaries or who employ the clichés of Tin-Pan Alley. Lampert v. Hollis Music, Inc., D.C. E.D.N.Y.1956, 138 F.Supp. 505. Cf. Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603, 606 ff.

It is clear that defendants' novel and play are not plaintiffs' offspring. Plaintiffs' story and the latrine inspection episode in defendants' writings are literary siblings sired by the same army anecdote. This conclusion, coupled with the previous finding that the latrine inspection episode contained in "Bucking for Section 8" was not original with plaintiff Cloth, leads to the Court's de-

finitive judgment that plaintiffs did not act in good faith when they instituted this action.

In joining this litigation as co-plaintiff, the corporate plaintiff acted with a degree of casualness that amounted to sheer recklessness. In his pre-trial deposition, the president and majority stockholder of the corporate plaintiff testified that he had been unable to find or otherwise obtain a single copy of the very magazine of which he claims to be the copyright proprietor (Transcript, 92, 93). He admitted that he had no actual knowledge as to whether plaintiff Cloth's writing had ever been printed in his magazine (Transcript, 110). He had never bothered to check whether, in fact, there were any similarities between Cloth's writing and "No Time for Sergeants" (Transcript, 107, 108). He was unable to produce any of the three assignments, referred to in the complaint, which form the basis of his claim to proprietorship of the writing here involved (Transcript, 81, 83, 86, 87, 90). The offhand manner in which the corporate plaintiff brought this action as the "copyright proprietor" after Cloth visited Gleason's office is depicted in the following testimony by Gleason (Transcript, 109):

> "He (Cloth) said that in Readers' Scope, in which he published the material, that there was an article, or articles, I have forgotten which now, which he considered had been infringed upon, and why didn't I call up Mr. Feinman; and I said—I looked at my spindle, I hadn't been in the office for some time, so I called up Mr. Feinman, and he called this to my attention, and I said 'go ahead'."

■ To charge an author with wilfully infringing a copyright by plagiarism is to charge him with a crime. 17 U.S.C.A. § 104. Dr. Samuel Johnson once said that the charge of plagiarism was " 'one of the most reproachful * * of literary crimes' ". Quoted in Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603, 606.

Plaintiffs' unreliability in this litigation is further illustrated by their resort to a weathervane argument that shifts with the winds of necessity. The complaint (paragraphs 11 and 12) charges that defendants' book and the play were "copied largely" from Cloth's story. Plaintiffs abandoned this assertion after the argument when—in order to devaluate the services of defendants' attorneys—plaintiffs minimize the alleged infringement: "From the very inception there was no question that the claimed infringement was a relatively small part of the book and play." (Plaintiffs' memorandum, p. 10)

■ The applicable statute, 17 U.S.C.A. § 116,[5] makes it mandatory for the Court to allow "full costs" to the prevailing party, but it is discretionary with the Court to award "a reasonable attorney's fee" as part of the costs.

In exercising judicial discretion, it is well to keep in mind Chief Justice Marshall's classic dictum:

> "When they (the courts) are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it." Osborn v. President, etc., of Bank of United States, 1824, 9 Wheat. 738, 865, 22 U.S. 738, 865, 6 L.Ed. 204.

In the present case, the statute does not exposit the public policy[6] to be ef-

---

5. "In all actions, suits, or proceedings under this title, * * * full costs shall be allowed, and the court may award to the prevailing party a reasonable attorney's fee as part of the costs."

6. The public policies to be subserved by the sanction of awarding counsel fees may vary from field to field. Unless cognate policies are to be enforced, the decisions in one field would not be valid analogies in another. While, therefore, the cases cannot be reduced to a common denominator of policy or rationale, they are suggestive of a methodology of

fectuated by the Court's exercise of its discretion in awarding "a reasonable attorney's fee" to the prevailing party. Nor does the statute suggest a formula or standard of evaluation.

The statute has, however, received extensive judicial exposition. Upon the basis of that authority, these general principles may be formulated:

(1) An attorney's fee is properly awarded when the infringement action has been commenced in bad faith, as where the evidence establishes that the plaintiff's real motive is to vex and harass the defendant or where plaintiff's claim is so lacking in merit as to present no arguable question of law or genuine issue of fact. Nichols v. Universal Pictures Corporation, 2 Cir., 1930, 45 F.2d 119; Rush v. Oursler, D.C.S.D. N.Y.1930, 39 F.2d 468; Lowenfels v. Nathan, D.C.S.D.N.Y.1932, 2 F.Supp. 73; Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603; Rose v. Connelly, D.C.S.D.N. Y.1941, 38 F.Supp. 54.

(2) Where the claim of infringement is not synthetic, capricious or otherwise unreasonable, such fees have not been allowed. Edward B. Marks Music Corp. v. Continental Record Co., 2 Cir., 1955, 222 F.2d 488; Morse v. Fields, D.C.S.D. N.Y.1954, 127 F.Supp. 63.

(3) "Generally speaking," it is "more consonant with the authorization in 17 U.S.C.A. § 40 [now section 116] of 'a reasonable attorney's fee'" to award "only a fair fee fairly earned  *  *  * rather than a punitive award". Chief Judge Clark (then Circuit Judge sitting as District Judge) in Rose v. Connelly, supra, 38 F.Supp. at page 56.

(4) In determining [7] what is a reasonable attorney's fee, the Court should take into account the following elements, among others: the amount of work necessary; the amount of work done; [8] the

---

judicial analysis. Cf. Academy Award Products, Inc., v. Bulova Watch Company, Inc., 2 Cir., 1956, 233 F.2d 449; Colgate-Palmolive Company v. Carter Products, Inc., 4 Cir., 1956, 230 F.2d 855, 866; Lampert v. Hollis Music, Inc., D.C. E.D.N.Y.1956, 138 F.Supp. 505, 510; Lucien Lelong, Inc., v. Dana Perfumes, Inc., D.C.N.D.Ill.1955, 138 F.Supp. 575, 583; John Hancock Mutual Life Insurance Company v. Doran, D.C.S.D. N.Y.1956, 138 F.Supp. 47, 50, note 2; Sunbeam Corporation v. Quint, D.C.D. Mass.1956, 139 F.Supp. 804; United States of America v. 44.00 Acres of Land, etc., 2 Cir., 1956, 234 F.2d 410. Study of the subject of counsel fees in even one particular area of the law, e. g., derivative and other class litigation, may give rise to a veritable literature. Cf. the penetrating article by Professor George D. Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658 (1956).

7. Referring to the statute, 17 U.S.C.A. § 116, District Judge Woolsey said in Lewys v. O'Neill, D.C.S.D.N.Y.1931, 49 F.2d 603, 618:

"Fortunately in copyright cases Congress has seen fit to leave the courts free to adopt the wise English practice of throwing a large part of the expense of litigation on the unsuccessful party."

8. The Court's analysis of the record and complete file shows that defendants' attorneys rendered the following services in this litigation:
Choate, Ronalds, Reynolds & Hollister

1. Searched for and found a copy of the November 1945 issue of Readers' Scope; examined same; and advised (December 1, 1955) plaintiff's attorney that Cloth's article did not appear therein.

2. Accepted (February 21, 1956) service of summons and complaint; and undertook to prepare a substantial defense to the action.

3. Carefully studied Cloth's article and defendants' novel and play.

4. Developed defenses designed to establish (a) by investigation and interview, that the latrine anecdote was in the public domain prior to plaintiffs' publication; (b) by legal research, that, having presented the article as factually true, plaintiffs were estopped from denying that it was in the public domain; (c) by investigation and interview, that defendants never had access to plaintiffs' article; and (d) by legal research, that a copyright does not protect a bare idea.

5. Served (March 6, 1956) client's answer and notice for the taking of depositions of both plaintiffs and for the production of documents.

skill employed; the monetary amount involved; [9] and the result achieved.

The foregoing principles and criteria have been applied to the evidence in this case in deciding to award reasonable attorneys' fees to the defendants herein and in fixing the amount of such fees.

■ Accordingly, the Court hereby awards severally to the defendants the following attorneys' fees: to Evans and

6. Attended (March 15, 1956) and took part in plaintiffs' pre-trial examinations.

7. Substantially completed preparation for trial.

8. By order to show cause moved for and secured a protective order and stay of client's examination pending disposition of motion for summary judgment.

9. Secured affidavits, including one executed in Georgia and another in Alaska, establishing the origin of the mechanical idea expressed in plaintiffs' writing to specific times and places.

10. Conferred with various present and former armed services personnel, including a retired general and a member of a named navigation school.

11. Conferred with plaintiffs' attorney and with attorneys for the other defendants.

12. William A. Moore and Dickerman Hollister, partners, have been in charge of case for the client; and over 80 man hours have been devoted to the above work.

Breed, Abbott & Morgan

1. Accepted (February 18, 1956) service of summons and complaint.

2. Caused a check to be made in the Library of Congress, through Washington correspondents, of the alleged copyright publication in November, 1945 issue of Readers' Scope; obtained copy of the registration certificate alleged in the complaint; paid correspondents $63.-25.

3. Served (March 6, 1956) answer and notice for the taking of depositions of both plaintiffs and for the production of documents.

4. Largely conducted pretrial examinations of both plaintiffs (March 15, 1956), the transcript running to 114 pages.

5. Obtained four affidavits establishing essential facts as to the origin of the latrine anecdote and also the Levin dramatic adaptation of the Hyman novel.

6. Received cross-notice of taking of deposition of defendant Evans, returnable March 20, 1956; and obtained adjournment of same.

7. Conferred with defendant Levin and prepared his affidavit.

8. Conducted extensive and detailed legal research.

9. Prepared papers to bring on motion for summary judgment.

10. Had several conferences with plaintiffs' attorney in connection with the motion for summary judgment; also permitted plaintiff Cloth to inspect certain evidence, as a result of which plaintiffs' attorney agreed to consent to the entry of a summary judgment against the plaintiffs on the merits.

11. Fully prepared the case for trial before making the motion for summary judgment.

12. Charles H. Tuttle, senior member of the firm, has been in charge of the defense since the inception of the case; Mr. Tuttle has been assisted by his associate, Thomas A. Shaw, Jr.

Weil, Gotshal & Manges

1. Received (October 28, 1955), letter from plaintiffs' attorney charging that the book published by defendant Random House, Inc. infringed the copyright of certain copyrighted material written by plaintiff Cloth; replied to said letter.

2. Read the book, "No Time for Sergeants."

3. Accepted (February 16, 1956) service of summons and complaint.

4. Examined November and December, 1945 issues of Readers' Scope at New York Public Library.

5. Conferred (March 5, 1956) with attorneys for the other defendants.

6. Agreed to serve (March 6, 1956) a joint notice in behalf of all defendants for the taking of plaintiffs' depositions.

7. Served answer.

8. Attended (March 15, 1956) and participated in pre-trial examination of plaintiffs.

9. Conferred with other defense attorneys in planning motion for summary judgment; joined in the making of said motion.

9. Plaintiffs'- action involved the probable life or death of a most valuable stage and literary production. Over a million copies of the Hyman novel have been sold. The Levin play has been and is a complete "sellout," grossing already over a million dollars. It is expected to run continuously for possibly three. or four years.

Rogers, the sum of $1,250; to Hyman, the sum of $1,250; and to Random House, Inc., the sum of $500.

These allowances are to be recoverable against the plaintiffs and are to be included, in accordance with the provisions of 17 U.S.C.A. § 116, as part of the costs to be taxed severally to the defendants in the judgment dismissing the complaint herein.

Settle order and judgment on notice.