In the Matter of **CONTINENTAL VEND-ING MACHINE CORP.**, Debtor.

In the Matter of **CONTINENTAL APCO, INC.**, Debtor.

Nos. 63–B–663, 63–B–959.

United States District Court,
E. D. New York.

July 28, 1970.

Supplemental Memorandum
Aug. 25, 1970.

Bauman & Marcheso, New York City, for trustee; Joseph J. Marcheso, New York City, of counsel.

Parker, Chapin & Flattau, New York City, for Automatic Canteen Co. of America; Alvin M. Stein, and Jordan M. Newman, New York City, of counsel.

Weil, Gotshal & Manges, New York City, attorneys and special co-counsel to the trustee; Alan B. Miller, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for James Talcott, Inc.; Julius Abeson, New York City, of counsel.

### Memorandum of Decision and Order

MISHLER, Chief Judge.

Parker, Chapin and Flattau moved for an order directing payment to them of attorneys' fees out of trust funds representing the proceeds of the sale by the trustees of vending machine routes of the debtor in Hammond, Indiana and St. Louis, Missouri.

### History

On October 3, 1961, Rowe Service Corporation (Rowe) sold to Continental Lake Vendors Corp. (Lake), a wholly owned subsidiary of the debtor, Continental Vending Machine Corp. (Vending), the vending machine business operated by Rowe in Lake and Porter Counties, Indiana. The sale was made pursuant to an agreement dated October 3, 1961.[1] The sale included approximately 360 cigarette vending machines together with the contract rights of Rowe to place the vending machines in the locations indicated in the various contracts. The contract price for the vending machines was $104,400 and, for the contract and location rights, the sum of $107,300, or a total of $211,700.[2]

Lake paid $100,000 in cash and the balance of $111,700 by executing and delivering a series of 35 notes in the principal amount of $3,100 each and the 36th note in the sum of $3,200, which notes were payable monthly, the first note maturing on November 1, 1961. The notes provided for acceleration at the option of the holder in the event of default on any single note. The notes were endorsed and guaranteed by Vending. The notes were unsecured.

The notes were paid monthly to and including the note due April 1, 1963. In the meantime, without knowledge to Rowe and on July 17, 1962, a joint special meeting of the stockholders and boards of directors of Lake and Vending resolved to dissolve Lake on September 30, 1962 and transfer all the remaining assets of Lake to Vending. On September 30, 1962, Lake was insolvent.

On March 29, 1963, an action was commenced by the Securities and Exchange Commission against Vending in which a

---

1. A memorandum of agreement was first executed in September, 1961.

2. The contract of October 3 recited the price for the 360 machines to be $211,700. A supplemental contract dated the same day allocated the total price as indicated.

conservator was appointed in the United States District Court for the Southern District of New York (No. 63-B-897).

There was a default in the note dated May 1, 1963, the 19th of the series.

Prior to May 22, 1963, Rowe transferred and assigned its right, title and interest in the notes due and to become due in the series to Automatic Canteen Company of America (Canteen). On that day, Canteen elected to accelerate payment of all the remaining notes.

In the interim and prior to September 30, 1962, James Talcott (Talcott) loaned $206,014.29 to Lake and, as security, accepted conditional sales contracts on all the cigarette vending machines owned by Lake, which included those conveyed by Rowe and others.

An involuntary petition pursuant to Chapter 10 of the Bankruptcy Act was filed against Vending and an order approving the petition was made on July 12, 1963. Canteen and Talcott filed claims in the proceeding based on the obligations referred to in addition to other claims. Two other creditors of Lake also filed claims in the proceeding against Vending; first, Morris Levy and Elizabeth Levy filed a claim in the sum of $43,708.32 representing the balance due on the purchase price for the sale of a vending machine route to Lake on September 1, 1959 and, second, the State of Illinois filed a claim for Retailers Occupancy Tax due from Lake for the period June 1, 1961 to September 25, 1961 in the sum of $3,006.

On October 8, 1963, the trustees of Vending sold the Hammond, Indiana route for the sum of $330,000. This sale included the vending machines and contract rights and locations which were sold by Rowe to Lake on October 3, 1961 in addition to other vending machines and contract rights. The value of the security of the Talcott obligation based on the value of the machines that were located was determined to be $85,405.72. Talcott, therefore, was an unsecured creditor to the extent of $120,608.

### Prior Proceedings

By petition dated December 4, 1963 and filed in the office of the Clerk of this court on December 23, 1963, Canteen claimed a prior lien on the proceeds of the sale of the Hammond, Indiana route on various grounds.[3] This court, in a decision dated August 18, 1964, dismissed the petition. The memorandum of decision dated that date held that the creditors of Lake had no lien in the assets fraudulently transferred or transferred in violation of Indiana's Bulk Sales Statute. On appeal, 358 F.2d 587 (2d Cir. 1966), it was held that Canteen, as a creditor of Lake, was the beneficiary of a constructive trust impressed upon the tranferred assets in the hands of the directors of Vending because the transfer was a distribution by Lake to its sole stockholder while Lake was insolvent. The court held:

"We hold them [directors of Vending] trustees of the corporation's property on behalf of the creditors [of Lake], so that as a class the creditors should be able to follow the property into the hands of the directors, here acting for the parent. There it remained when the trustee in bankruptcy was appointed, and he took subject to that trust." 358 F.2d at 590.

3. The petition alleged a fraudulent transfer from Lake to Vending on or about October 1, 1962, a transfer of assets without consideration, a transfer in violation of the Bulk Sales Act and that the transfer rendered Lake insolvent.

The brief (Points I and II) says that Lake's assets were never transferred to Vending and, if transferred, under Indiana Law, were transferred subject to a lien and a constructive trust in favor of Lake's creditors if the transfer was either fraudulent, made without fair consideration or in violation of the Indiana Bulk Sales Statute.

Point VI argued that the transfer constituted an illegal dividend by Lake to Vending, its sole stockholder, under the Indiana General Corporation Act and, therefore, a constructive trust arose in favor of the creditors of the corporation under Fricke v. Angemeier, 53 Ind.App. 140, 101 N.E. 329 (1913).

*The Right to Reimbursement for Attorneys' Fees*

At the time of the institution of the proceeding by Canteen by petition dated December 4, 1963, this court considered the unsecured creditors of Lake as general unsecured creditors of Vending. Canteen's prosecution of its claim to a prior right in the proceeds of the sale of the Hammond route ultimately established the creditors as cestui of a trust fund in the hands of the directors of Vending at the time of the filing of the petition pursuant to Chapter 10 against Vending.

In this country, as distinguished from the English practice, the general rule is that attorneys' fees are not recoverable as costs. In the conventional meaning of the term "costs", described as costs between "party and party", such fixed costs are taxable against the losing party. What is sometimes called "costs" as between "solicitor and client" is really a charge against a fund used to reimburse one of the parties benefited by the fund who has assumed the prosecution of the claim for the benefit of himself and other parties. Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882); Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); 6 Moore, Federal Practice 1348 et seq. [2d ed.]; Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

In *Greenough*, one Vose brought an action on behalf of himself as a bondholder and others similarly situated to prevent wasting of assets. He succeeded in the litigation and filed a bill of complaint for his reasonable costs, counsel fees, and charges and expenses in the litigation. The Court noted, at 105 U.S. 529, 26 L.Ed. 1159, that "the litigation was carried on with great vigor and that much expense and, in fact, a large amount of the trust fund was secured and saved." The Court permitted reimbursement of his litigation expenses "incurred in the fair prosecution of the suit and rescuing the trust fund and causing it to be subjected to the purposes of a trust."

The right to recover litigation expenses is not confined to those cases where the plaintiff sues for a class. In *Sprague, supra,* the form of the litigation requested relief only for the plaintiff.

> "But in view of the consequences of stare decisis, the petitioner by establishing her claim necessarily established the claims of fourteen other trusts pertaining to the same bonds. (307 U.S. at 166, 59 S.Ct. at 780)
>
> \* \* \* \* \* \*
>
> Whether one professes to sue representatively, or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for one's costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility. In the actual exercise of the power to award costs "as between solicitor and client" all sorts of practical distinctions have been taken in distributing the costs of the burden of the litigation."

Though the right to reimbursement appears to be in the litigant, it was early recognized that counsel for the litigant had the right to make application for the value of the services to the other beneficiaries of the fund created through the efforts of counsel. Central R. R. & Banking Co. v. Pettus, 113 U.S. 116, at 124–125, 5 S.Ct. 387, 28 L.Ed. 915

(1885). *Cf.* Gibbs v. Blackwelder, 346 F.2d 943 (4th Cir. 1965).[4]

We now turn to the claim of Canteen's attorney and their request to charge the trust fund, consisting of the proceeds of the sale of the St. Louis route, for services rendered Canteen in connection with the Hammond, Indiana route.

Continental St. Louis Corp. (St. Louis) was a wholly owned subsidiary of Vending. It operated vending machine routes in the City of St. Louis, Missouri. As in the case of Lake, it was resolved to dissolve St. Louis by resolution dated July 17, 1962, to become effective September 30, 1962. The resolution provided for the transfer of all remaining assets to Vending. It does not appear from the record before me in the instant proceeding when the transfer of the assets from St. Louis to Vending occurred or whether St. Louis was insolvent when the transfer took place or whether St. Louis was insolvent on September 30, 1962.[5]

The Trustee sold the St. Louis route pursuant to court authorization by orders dated October 23, 1963 and December 31, 1963 for $192,484.44. Title closed on January 3, 1964.

Talcott was a secured creditor in the amount of $154,446.01 and in the sum of $23,970.71. The latter sum was paid in full out of the proceeds of the sale. However, the equipment in the sale identified as securing the former obligation,

i. e., $154,446.01 was valued at only $60,-812.75. Talcott became a "trust fund" creditor to the extent of $93,633. in the proceeds of the sale of the St. Louis route. The creditors of St. Louis, to the extent that their obligations were unsecured, were thus classified.

Similarly, Bedford Capital Corporation, a partially secured creditor having a claim of $2,235.84, located equipment valued at $1,800 and became a "trust fund" creditor to the extent of $436.

Aron and Aron, an unsecured creditor of St. Louis, whose claim was assigned to B.F.C. Corporation, became a "trust fund" creditor in the amount of $29,529.

The First Pennsylvania Banking and Trust Co. was fully secured and recovered $4,804. out of the proceeds.

Inland Credit Corporation and Automatic Canteen Company of America were secured creditors in part.[6] The claims however arose after September 30, 1962.

The petition of Parker, Chapin and Flattau bases its right to charge this fund on the theory that the benefits accruing to the "trust fund" creditors resulted from "* * * the decisions obtained by Parker, Chapin and Flattau concerning the Hammond route and by the attorneys for American Catalogue Company concerning the Detroit route." (Affidavit, Alvin M. Stein, verified May 21, 1970, p. 4, par. 6).[7]

4. In that case, the District Court denied fees to the litigant's lawyer where other claimants benefited by the result in the creation of a fund. The court said, at p. 945:
   "The District Court was under the impression that the request for the allowance of fees for the plaintiffs' attorneys was for the benefit of the attorneys and not for the benefit of the plaintiffs. He said in his memorandum opinion:
   'The fees here claimed would not go to the plaintiffs. They are for the attorneys. The plaintiffs have not asked that they be reimbursed for attorney fees incurred. In any event they would not be entitled to recover more than they had agreed to pay their attorneys and there is no evidence in this case what that amount is.'

   Now, at least, it is clear that the request for the allowance of fees is for the benefit of the plaintiffs."

5. In view of the court's determination, a resolution of these issues is not material.

6. Inland was a creditor in the amount of $5,365.29. The sum of $2,400. was recovered in locating chattels of that value encumbered by Inland's lien. Inland is a senior creditor in the proceeding to the extent of $2,965.
   Canteen was a creditor in the amount of $4,572.57. The value of the security was $1,950. Canteen is a senior creditor in the proceeding in the amount of $2,622.

7. The affiant alludes to a memorandum of decision made by the undersigned dated

The creation of the trust fund in each case was based on state law. In the case of the Hammond route, it was based on Indiana law and, in the Detroit case, on Michigan law. The Trustee, in determining that the creditors of St. Louis, prior to September 30, 1962, to the extent that they were unsecured, could follow the assets into the hands of Vending, St. Louis' sole stockholder, was based on Missouri law. The opinion of the court of appeals in the petition of Canteen and of this court in American Catalogue did not establish the fund in St. Louis. The use of those opinions in guiding the Trustee in interpreting Missouri law was no different than the use of the reported cases that the courts made in arriving at those decisions. The benefit of those opinions was indirect. The fund was not established, as in Sprague, as "the consequences of stare decisis."

█ The application by Parker, Chapin and Flattau is granted to the extent of charging the "trust fund" credited to the Hammond route with the reasonable value of the attorneys' services rendered to the beneficiaries of the fund and with other litigation costs that were reasonably necessary in establishing the fund.

█ The petition is denied to the extent that it seeks to charge the St. Louis trust fund with costs of litigation in the proceeding establishing the trust fund out of the proceeds of the sale of the Hammond route.

The parties are directed to appear at an evidentiary hearing to be held before the undersigned on Friday, July 31, 1970, at 11 A.M.

The entry of a final order will await the determination of the reasonable value of the litigation costs and the apportionment thereof among the beneficiaries of the trust.

*Supplemental Memorandum of Decision*

The court having found, in a memorandum of decision dated July 28, 1970, that Parker, Chapin and Flattau are entitled to fees for services rendered that benefited creditors of Continental Lake Vendors Corp., and the court having held a hearing to determine the reasonable value of the services rendered to the beneficiaries, the court makes the following findings of fact:

1. Parker, Chapin and Flattau (Parker), as attorneys for the Automatic Canteen Company of America, legally established and preserved, from 1963 through 1970, a trust fund of the monies obtained through the sale of the assets of Continental Lake Vendors Corp., a one-time subsidiary and then division of Continental Vending Machine Corp.

2. The partners and associates of the Parker firm expended a total of 838 hours during this eight year period in order to establish and preserve the above mentioned trust fund. Approximately 462 hours were spent in establishing the fund from 1963 through the Spring of 1966, while 376 were spent in maintaining or preserving the fund in the later period.

3. Six attorneys belonging to the Parker firm were involved in this matter, some sporadically, some for long periods of time. The six attorneys were, in descending order of seniority, Chapin, a senior partner of the firm, Stein, the litigation partner, Pillar, a senior associate, Newman, a recent graduate of law school when the case began, and Kaplan and Hurwitz, both members of the class of 1969 at their law school.

4. The six attorneys referred to in paragraph "3" above were responsible for the following numbers of billable hours of work concerning this trust fund

June 11, 1965 concerning the Detroit route on the petition of American Catalogue Company. The court found that under Michigan law, creditors of a *solvent*

corporation could follow the assets of the corporation into the hands of the stockholder distributee, i. e., Vending.

matter during the period under consideration:

| Newman | 593 hours |
|--------|-----------|
| Kaplan | 125 hours |
| Stein | 67 hours |
| Chapin | 41 hours |
| Pillar | 8 hours |
| Hurwitz | 4 hours |

5. The value of the work performed by Parker is to be computed using the following hourly rates, taking into consideration the seniority and experience of the several attorneys:

| Newman | $25 per hour |
|--------|--------------|
| Kaplan | $20 per hour |
| Stein | $35 per hour |
| Chapin | $50 per hour |
| Pillar | $25 per hour |
| Hurwitz | $20 per hour |

6. When the hourly rates referred to in paragraph "5" above are considered in relation to the number of hours of work done, as set out in paragraph "4" above, the result is a total of $21,000.

7. The creditors of Continental Lake Vendors Corp. who became beneficiaries of the trust fund established and preserved through the efforts of the Parker firm were, in descending order related to the size of their claims:

James Talcott, Inc.

Automatic Canteen Company of America

Elizabeth Levy, as assignee, and Morris Levy

State of Illinois

8. The claims of the four creditors listed in paragraph "7" above aggregated $223,223.04; and the claims of secured creditors of Continental Lake Vendors Corp. (of which Talcott was one to the extent of $85,405.72) amounted to $198,485.72, leaving a total of $421,708.-76 in claims to be satisfied from the traceable funds resulting from the sale of the assets of Continental Lake Vendors Corp.

9. The traceable funds resulting from the sale of the assets of Continental Lake Vendors Corp. which subsequently became available for distribution to trust fund creditors and secured creditors totaled $323,799.20 or 76.78% of the total amount of claims referred to in paragraph "8" above.

10. Of the $323,799.20 available for distribution to trust fund creditors and secured creditors, $152,416.56 was available for distribution to the secured creditors, or 76.78% of their claims, and $171,382.64 was available for distribution to the trust fund creditors or 76.-78% of their claims.

11. The $171,382.64 available for distribution to the trust fund creditors was distributed in the following manner:

| to James Talcott, Inc. | $ 92,602.29 |
|---|---|
| to Automatic Canteen Company of America | $ 42,935.75 |
| to Elizabeth Levy, as assignee, and Morris Levy | $ 33,545.60 |
| to the State of Illinois | $ 2,299.00 |
| | $171,382.64 |

12. The beneficiaries of the trust fund resulting from the sale of the assets of Continental Lake Vendors Corp. are senior creditors of Continental Vending Machine Corp. to the extent of the unsatisfied portion of their claims.

13. Had no trust fund been established, the present beneficiaries of the trust fund would have been senior creditors of Continental Vending Machine Corp. to the extent of the entire amount of their claims.

14. The senior creditors of Continental Vending Machine Corp. will receive 44% of their claims in the first distribution to be made.

15. There is a reasonable expectation that senior creditors will ultimately receive in excess of 50% of their claims and may receive as much as 85% of their claims.

16. When the amount of the distribution to trust fund creditors related in paragraph "10" above, $171,382.64, is subtracted from the aggregate of the claims of the trust fund creditors as stated in paragraph "8" above, the resultant amount of unsatisfied claims is $51,840.40.

17. As senior creditors of Continental Vending Machine Corp. (paragraph "12" above) the trust fund beneficiaries will receive 44% of their unsatisfied claims on the first distribution, or $22,809.78 (paragraph "14" above).

18. As senior creditors of Continental Vending Machine Corp. (paragraph "12" above) the trust fund beneficiaries may receive 85% of their unsatisfied claims before the final winding-up of Continental Vending Machine Corp., or $44,064.34 (paragraph "15" above).

19. Were no trust fund to have been established, the present beneficiaries of the trust fund, as senior creditors of Continental Vending Machine Corp. (paragraph "12" above), would have received 44% of their total claims; which total claims were $223,223.04, and 44% of that figure being $98,218.38.

20. As trust fund creditors to the extent of 76.78% of their claims and senior creditors of Continental Vending Machine Corp. for the remainder, the trust fund creditors will have received, as of the first distribution, $194,192.42, which equals the amount of the distribution to the trust fund creditors *qua* trust fund creditors, $171,382.64, when added to the amount of the distribution to the trust fund creditors *qua* senior creditors, $22,809.78.

21. Were the first distribution to senior creditors the only one to be made, the existence of the trust fund would have benefited the trust fund beneficiaries by $95,974.28, which equals the amount which would be received by the trust fund beneficiaries were they only senior creditors when subtracted from the amount they will receive as trust fund beneficiaries and senior creditors.

22. Were no trust fund to have been established, the present beneficiaries of the trust fund, as senior creditors of Continental Vending Machine Corp., might receive a total of 85% of their total claims; which total claims were $223,223.04, and 85% of that figure being $189,739.58.

23. As trust fund creditors to the extent of 76.78% of their claims and senior creditors of Continental Vending Machine Corp. for the remainder, the trust fund creditors may receive, before the final winding-up of Continental Vending Machine Corp., $215,446.98, which equals the amount of the distribution to the trust fund creditors as trust fund creditors, $171,382.64, when added to the amount that the trust fund creditors may receive as senior creditors before the final winding-up of Continental Vending Machine Corp., $44,064.34.

24. Were senior creditors to receive 85% of their claims, the existence of the trust fund would have benefited the trust fund beneficiaries by $25,707.40, which equals the amount which would be received by the trust fund beneficiaries were they only senior creditors when subtracted from the amount they will receive as both trust fund beneficiaries and senior creditors.

25. In relation to the total amount of claims, as against the trust fund, James Talcott, Inc., owns 54% of the claims; Automatic Canteen Company of America owns 25% of the claims; Elizabeth Levy, as assignee, and Morris Levy own 19% of the claims; and the State of Illinois owns 2% of the claims.

26. The monies to be distributed from the trust fund will be distributed according to the percentages mentioned in paragraph "25" above.

27. Were senior creditors to receive only 44% of their claims, the total benefits to the trust fund beneficiaries from the trust fund would be $95,974.28, which sum would be apportioned according to the percentages mentioned in paragraph "25" above, which apportionment would result in the following monetary benefits:

```
to James Talcott, Inc. ...............$51,826.11
to Automatic Canteen Company of Amer-
  ica  ............................$23,993.57
to Elizabeth Levy, as assignee, and Morris
  Levy  ...........................$18,235.11
to the State of Illinois ...............$ 1,919.49
                                    $95,974.28
```

28. Were senior creditors to receive 85% of their claims, the total benefits to the trust fund beneficiaries from the trust fund would be $25,707.40, which sum would be apportioned according to the percentages mentioned in paragraph "25" above, which apportionment would result in the following monetary benefits:

| | |
|---|---|
| to James Talcott, Inc. | $13,882.00 |
| to Automatic Canteen Company of America | $ 6,426.85 |
| to Elizabeth Levy, as assignee, and Morris Levy | $ 4,884.40 |
| to the State of Illinois | $ 514.15 |
| | $25,707.40 |

29. Automatic Canteen Company of America, one of the trust fund beneficiaries, is the client of the Parker firm, and has paid approximately $25,000 to date for services rendered in connection with the trust fund matter.

30. The percentage of distributive share to senior creditors is dependent to a significant degree on the size of the semi-annual payments due from the Vendo Company over the next nine years.[1]

### Discussion

As the court stated in In re Detroit International Bridge Co., 111 F.2d 235, 237 (6th Cir. 1940); "[w]here the compensation of an attorney is to be fixed by the court, the attorney is entitled to the fair and reasonable value of the services rendered." This standard of "reasonableness" applies as well in cases where there is a fund in court, secured by the efforts of petitioning attorneys, out of which their compensation, or a part of it, is to come. *See* Central R.R. & Banking Co. of Georgia v. Pettus, 113 U.S. 116, 127, 5 S.Ct. 387, 392, 28 L.Ed. 915 (1885); Wallace v. Fiske, 80 F.2d 897 (8th Cir. 1935), modified on rehearing 80 F.2d 905, 910, cert. denied 298 U.S. 675, 56 S.Ct. 940, 80 L.Ed. 1397 (1936); Bebchick v. Public Util. Comm'n, 115 U.S.App.D.C. 216, 233, 318 F.2d 187, 204 (1963).

In discussing the various elements of "reasonableness," courts and commentators have constantly reiterated general factors, differing only where the specific requirements of a certain type of suit make variation necessary.[2] A seminal source of guidance in this area has been Canon 12 of the Canons of Professional Ethics, now Ethical Consideration #2–18 of the Code of Professional Responsibility. This section states that "[t]he fees of a lawyer will vary according to many factors, including the time required, his experience, ability and reputation, the nature of the employment, the responsibility involved, and the results obtained." A further, and somewhat more elaborate treatment of the factors involved, can be found in the oft-quoted opinion of Judge Woolsey in In re Osofsky, 50 F.2d 925 (S.D.N.Y.1931):

The elements to be considered in determining an attorney's fee were once most aptly summarized in evidence given on a reference by Honorable William G. Choate, formerly a judge of this court, and David B. Ogden, a well known lawyer of a generation ago.

1. In July 1964, Continental Vending Machine Corp. and its subsidiaries sold all of their manufacturing assets to the Vendo Company for $1,250,000 in cash besides which there was an additional $150,000 cash adjustment for inventory. Additional payments were made and are to be made in the future over a period of 15 years from July 31, 1964 at the rate of 2% of the sales of all electrically operated cigarette vending machines and post-mix soda vending machines; such additional payments not to exceed a total of $5,250,000, but not to be less than annual amounts of $50,000 payable semi-annually or a total guaranteed minimum of $750,000. Payments since July 31, 1964 have averaged $200,000 a year.

2. Thus, in bankruptcy cases, the court must attend to the principle of economy, see 3A Collier on Bankruptcy ¶ 62.12 [5] (14th Ed.), while in stockholder suits the court must consider the encouraging effects such actions may have on others similarly situated, *see* Angoff v. Goldfine, 270 F.2d 185 (1st Cir. 1959).

They laid down the following elements as being matters properly to be considered when the fees of an attorney have not been agreed on beforehand, but are to be fixed: (1) The time which has fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk involved and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practising.

Each case, of course, differs to some extent from every other case in respect of the importance of these several elements.

In some cases the time element is dominant; in others the skill used seems specially to stand out; and in others still, the amount which a defendant has been saved, or which a plaintiff has recovered, may be the dominating consideration in the charge. But if all these elements are considered together, and the relative importance of each element is fairly weighed by an attorney, it is possible to arrive at a proper charge in almost any case without much difficulty. 50 F.2d 925, at 927.

These factors were discussed once again in Angoff v. Goldfine, 270 F.2d 185 (1st Cir. 1959), where the court listed the elements as:

* * * the amount recovered for the corporation; the time fairly required to be spent on the case; the skill required and employed on the case with reference to the intricacy, novelty and complexity of issues; the difficulty encountered in unearthing the facts and the skill and resourcefulness of opposing counsel; the prevailing rate of compensation for those with the skill, experience and standing of the attorneys * * *; the contingent nature of the fees, with the accompanying risk of wasting hours of work, overhead and expenses (for it is clearly established that compensation is awarded only in the event of success); and the benefits accruing to the public from suits such as this. 270 F.2d 185, at 189.

As can be seen from these quotations, most of the factors involved are agreed upon. However, as stated in In re Osofsky, *supra,* the controlling factor will differ from case to case. *See also,* Note, 49 Yale L.J. 699 (1940); Note, 6 U.Chi. L.Rev. 484 (1936); Pergament v. Kaiser-Frazer Corp., 224 F.2d 80 (6th Cir. 1955); Cloth v. Hyman, 146 F.Supp. 185 (S.D.N.Y.1956).

In deciding upon the compensation to be awarded attorneys in cases like the instant one, the court must walk a very fine line. It must afford "reasonable" fees to the attorneys involved. Nevertheless, the Supreme Court has stated its desire to make it "clear * * * that the judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter [can] receive no countenance." In re Gilbert, 276 U.S. 294, 296, 48 S.Ct. 309, 310, 72 L.Ed. 580 (1928).

With such strictures clearly in mind, we must evaluate the situation in the light of the elements discussed here. As regards time, the 838 hours spent by the applicant Parker firm are found to be "fairly and properly" expended on work necessary for the establishment and preservation of the trust fund of the Continental Lake Vendors Corp. assets. Even though a certain part of the time spent from 1967 through 1970 involved a settlement which decreased the fund, Parker used its best efforts to make sure that that settlement was favorable.

Thus, those efforts can in no way be considered unnecessary or peripheral to the preservation of the fund.

The "prevailing rate of compensation" for the lawyers involved was discussed at the hearing and the resulting hourly rates are set forth in the Findings of Fact. When these rates are multiplied by the number of hours spent on the case, the resulting figure is $21,000, which sum we feel to be an accurate reflection of time spent and skill and experience.

One of the more difficult questions in this case concerns the "benefit" factor. The "benefits" conferred in a situation like the present one involving a constructive trust have been said to be the "creation, increase or protection" of the fund. Buell v. Kanawha Lumber Corp., 201 F. 762, 769 (E.D.S.C.1912). However, in most of the prior cases concerning such trusts, the beneficiaries have received sums which, the trust fund apart, they had absolutely no hope of otherwise regaining. Thus, in Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882), the fund was created by voiding the fraudulent conveyances of the trustees of properties held as security for bondholders. Had the action not been brought, the bondholders would have had no other means of recompense. The same was true in Central R.R. & Banking Co. of Georgia·v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), where a company had attempted to renege on certain bonds on which it was liable. In the instant case it has been found that the beneficiaries of the trust fund concerning the assets of Continental Lake Vendors Corp. were also senior creditors of Continental Vending Machine Corp., and would have been compensated as such had the trust fund not been established. Consequently, it can be seen that the benefits, in the instant case, by no means equal the entire amount of the trust fund. Rather, the benefit is the difference between what the trust fund beneficiaries will now receive through the establishment of the trust fund and what they would have received as senior creditors without the establishment of the trust fund. ·

At this stage, further problems arise. For although the benefits can be computed as previously discussed, with reference to what the trust fund beneficiaries would get as senior creditors of Continental Vending Machine Corp., it is by no means certain what those senior creditors will finally obtain. The outer limits have been established. It is known that the first distribution, to be made in the near future, will be a dividend of 44%. The distribution to senior creditors is reasonably expected to exceed 50% and may reach 85% of the claims. Under these circumstances, the amount of actual benefit conferred must remain conjectural to a certain degree. Yet a decision must be made, as the trust fund has been almost entirely distributed and will be gone before the end of the nine-year period during which further distributions to senior creditors will be made.

■ Using the figures explained in the Findings of Fact, the benefits accruing to the trust fund beneficiaries will not exceed $95,974.28, and may very probably be as low as $25,707.40. In this situation, it would be inequitable to award more than 50% of the minimum benefit possible as compensation to the attorneys. It is true that, at the beginning of the case, in 1963, Parker had no forewarning that the distribution to the senior creditors would be so high, or that the trust fund beneficiaries would be among those awarded senior creditor status in the plan of the trustee of Continental Vending Machine Corp. Nevertheless, the court must deal with realities as they stand, not with past misconceptions. Furthermore, "[w]e are and should be champions of the doctrine that the lawyer laborer is worthy of his hire, but those who are to be paid by allowances from funds administered by courts of bankruptcy must expect to be moderately compensated rather than

richly rewarded." Texas Bank and Trust Co. v. Crippen, 235 F.2d 472, 476 (5th Cir. 1956) Any allowance higher than the 50% heretofore mentioned would raise the danger that the trust fund beneficiaries would in no way be better off by the existence of the trust fund. It must also be kept in mind that the applicant attorneys are not working on a contingent fee basis, and, according to our calculations of the worth of their services, have been fully rewarded by their client.

■ We next must decide which interests will contribute to the allowance for the attorneys. It is settled that where the attorneys' original client has already negotiated a private fee, that client's portion of the recovery shall not be charged. Central R.R. & Banking Co. of Georgia v. Pettus, 113 U.S. 116, 127, 5 S.Ct. 387, 392, 28 L.Ed. 915 (1885); Muskegon Boiler Works v. Tennessee Valley Iron & R. Co., 274 F. 836, 838 (M.D.Tenn.1921). The same result can be reached here by allowing 50% of the minimum benefit allocable to each of the three trust fund creditors other than Parker's client.

The aliquot shares of the beneficiaries to be charged, in the $25,707.40 minimum benefit, have been stated in paragraph "25" of the Findings of Fact. When those percentages are applied to the figure of $25,707.40, we find that Talcott will receive $13,882.00 of the benefit, the Levys will receive $4,884.40 as their share, and the State of Illinois will receive $514.15. Fifty percent of the Talcott benefit equals $6,941.00; fifty percent of the Levy benefit equals $2,442.20; and fifty percent of the Illinois benefit equals $257.08. The sum of these amounts, or $9,640.28, will be the award in this case.

■■ Talcott has argued that its portion of the trust fund should not be charged with the attorneys' fees, as it claims that it has lost more by the establishment and preservation of the trust fund than it has gained. It points out that it has not only contested the establishment of the fund, but has also given up large claims in settlement negotiations following the fund's establishment. In response to this it must be said, first, that those who benefit by a fund are liable for attorneys' fees, even if they have contested its establishment. Buford v. Tobacco Growers' Co-op. Ass'n, 42 F.2d 791 (4th Cir. 1930). Second, although it is true that in some circumstances a party who has lost significantly more than he has gained by the establishment of a trust fund will not be liable for attorneys' fees, see Simmons v. Friday, 190 F.2d 849 (8th Cir. 1951); Brown v. Pennsylvania Ry. Co., 250 F. 513 (3d Cir. 1918) cert. denied 248 U.S. 558, 39 S.Ct. 6, 63 L.Ed. 420 (1918), the present case is distinguishable due to the fact that in prior cases where recovery was barred the party seeking to escape payment had lost by the action of a judgment, rather than by the voluntary relinquishment of a claim, as here.

■ There remains one question to be decided, and that concerns the disposition of the $9,640.28 allowed in this case. No problem arises where, as in *Greenough, supra,* the recovery is sought by the original plaintiff himself as reimbursement for the funds expended. *See also* Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). Where, however, the suit is brought by the attorney of the original plaintiff, and the recovery sought is in the nature of quantum meruit rather than reimbursement, the courts are divided as to the proper course to follow. In *Pettus, supra,* the attorney was allowed recovery without any reimbursement of the original plaintiff being directed by the court. It must be stated, however, that that case involved a contingent fee, and the attorney's original understanding with his original client took into account the possible recovery the attorney might have as against other beneficiaries. In Wallace v. Fiske, *supra,*

the attorney was allowed to recover, quantum meruit, against beneficiaries of the fund created by his efforts, where a fee had been fixed and paid by his original client and no reimbursement was contemplated, nor contingent recovery planned. However, in Gibbs v. Blackwelder, 346 F.2d 943 (4th Cir. 1965), the court directed that the fees allowed out of the fund created be credited "by the attorneys against the contractual obligation of the plaintiffs to pay fees to them. * * *" (at 946). Although there is an unstated erroneous assumption in the court of appeals' decision that payment of attorneys' fees out of a fund is only permissible when it is in the nature of reimbursement, we feel that the action of that court involves the better choice, and will follow it here. But, unlike the situation in *Gibbs,* the client here has already paid the attorneys their fees. Parker has indicated that it has no objection to payment to the client. Thus, we direct the trustee to pay to the Automatic Canteen Company of America $9,640.28, and to debit the sums payable to the three other trust fund creditors by the amounts referred to earlier.

### Determination

The trustee is directed to pay to Automatic Canteen Company of America out of the funds held to the credit of the proceeds of the sale of the Hammond Route the sum of $9,640.28 and to charge the distributive shares of the following beneficiaries in the following amounts:

```
James Talcott, Inc. ...................$6,941.00
Elizabeth Levy, as assignee, and
  Morris Levy ......................$2,442.20
State of Illinois .....................  257.08
                                    $9,640.28
```

The trustee is directed to submit an order directing the distribution of the trust fund in accordance with the order made and entered on July 24, 1970 reflecting the charges for legal fees against the interest of Talcott, Levy and Illinois as set forth herein, and in accordance with this memorandum of decision.